# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW MEXICO

THOMAS BOCK, on behalf
of himself and all others similarly situated,

     Plaintiff,

v.                                      Civ. No. 19-1163 WJ/GJF

SALT CREEK MIDSTREAM LLC,

     Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[1]

At first blush, this lawsuit might pass as one in a wave of garden-variety, wage-and-hour disputes between workers in the oil and gas industry and the business entities they allege to be their employers.  But it doesn't take the informed reader long to get the sense that this case is only the latest skirmish in a running battle between interest groups in employment litigation, with one side looking to weaponize the sweeping effect of mandatory individual arbitration while the other side seeks to neutralize it.  In the oil and gas industry alone, federal courts across the country are being asked with increasing regularity to parse the language of arbitration agreements and waivers of collective action to determine whether and how they apply to the claims and parties before them.  The stakes are high, for the threat posed to an oil and gas employer by a two-hundred-plaintiff class action in a courtroom is much more ominous than if those plaintiffs were splintered up and compelled to pursue their claims in individual arbitrations.  The flip side is severe, too, for the financial incentive of workers (and their counsel) to bring these cases is vastly different depending

---

[1] Pursuant to an Order of Reference filed by the presiding judge on March 13, 2020 [ECF 28], this PFRD addresses Kestrel Field Services, Inc.'s Motion to Intervene [ECF 31] ("Kestrel's MTI"), (2) Defendant's "Amended Motion to Compel Arbitration" [ECF 66] ("Defendant's MTC"), and (3) Kestrel's Motion to Compel Arbitration [ECF 44] ("Kestrel's MTC").  Each of these motions has been fully briefed and were heard at oral argument on May 20, 2020.

on whether they are class actions heard by judges and juries or individual disputes decided by arbitrators.

Soon enough, if they haven't already, oil patch employers will fine-tune their arbitration agreements and collective action waivers to eliminate the ambiguities, gray areas, oversights, and loopholes that the current generation of lawsuits – including this one – have slid under the judicial microscope.  In the meantime, however, the three motions before this Court for a recommended disposition raise novel and difficult questions about choice of law, contract interpretation, and the elasticity of a state supreme court's estoppel doctrine.  It is not often in this Court's experience that the legal questions in a case are as close and as debatable as they are here.  Nevertheless, after entertaining extensive oral argument, reviewing the parties' written submissions, and considering relevant legal authorities, the Court recommends that (1) Kestrel's MTI be **GRANTED**, (2) Kestrel's MTC be **GRANTED IN PART** and **DENIED IN PART**, and (3) Defendant's MTC be **DENIED**.

## I.   BACKGROUND

Defendant is a midstream operator in the oil and gas industry.  To expand its transportation capacity, Defendant commissioned in 2018 the construction of a pipeline project in the Permian Basin, with a portion of the pipeline originating in New Mexico and the lion's share of the project to be built in Texas.  For its part, Kestrel is best thought of as a staffing company that furnishes skilled employees to customers whose projects exceed the capability of their in-house workforce.  Here, Defendant contracted with Kestrel to provide platoons of personnel qualified to inspect pipeline-related features like welding and coating.  Under the contract, formally known as a Master Service Agreement ("MSA"), Kestrel provided Defendant with inspection services at various job sites throughout west Texas and southeast New Mexico.

2

The inspectors, two of whom are Plaintiffs Thomas Bock and Brett Rice, were hired by Kestrel as its employees.  Kestrel created and stored all human resource-related documents that Plaintiffs completed at the onset of their employment.  As a condition of the inspectors' employment, Kestrel required each of them to execute a bilateral Arbitration Agreement ("AA") and class action waiver.  Once the inspectors signed all the paperwork and executed their AAs, Kestrel then directed the inspectors to specific job sites of Defendant to provide inspection services.  Plaintiffs submitted their time sheets to Kestrel and were paid by Kestrel.  As has been common in the oil and gas industry, Kestrel paid Plaintiffs a "day rate" as opposed to a straight salary or an hourly wage.  Viewing the inspectors as exempt under federal and state wage-and-hour laws, Kestrel did not pay its inspectors overtime, no matter how many hours they worked in a given week.

This pay configuration gave rise to the instant lawsuit.  But rather than bringing claims against Kestrel, which hired and paid them, Plaintiffs instead have sued only Kestrel's customer, Defendant Salt Creek.  As explained in greater detail *infra*, Plaintiffs allege that Defendant – not Kestrel – is their "true" employer.  Plaintiffs have affirmatively disclaimed the theory that Defendant and Kestrel were their "joint employers," opting instead to proceed on the single legal theory that Defendant was their actual employer and that its pay structure and policy violated both the Fair Labor Standards Act and the New Mexico Minimum Wage Act.[2]  In response, Defendant and Kestrel accuse Plaintiffs of "artfully pleading" their complaint to omit any mention whatsoever of their employment with Kestrel – indeed, to omit any mention of Kestrel *at all*.[3]  They assert that

---

[2] *See* Tr. of Oral Argument ("Tr.") at 52 ("THE COURT:  Okay, are you *expressly denying* that your theory is one of joint employer liability?  MR. BURCH:  *Yes*, the allegation in this complaint is one of employer liability.") (emphasis added).

[3] At oral argument, in response to the Court's question as to why Plaintiffs did not name Kestrel as a defendant, their counsel offered two reasons.  The first was "that we did not sue Kestrel . . . because Kestrel has an arbitration agreement and we preferred to proceed in Court."  Tr. at 49.  The second reason was "that in terms of finding somebody

Plaintiffs have done so for one purpose only:  to circumvent, avoid, and frustrate the AA they each executed with Kestrel.  To vindicate its own interests and perhaps to keep faith with a customer, Kestrel has moved to intervene and to compel Plaintiffs to individually arbitrate all of their claims, including those against Defendant.  As a non-signatory to the AAs, Defendant has moved to compel Plaintiffs to individual arbitration on the theory of equitable estoppel.

The Court first determines whether Federal Rule of Civil Procedure 24 permits Kestrel to intervene in the action.  Because the Court recommends that intervention be allowed, the Court next will address Kestrel's request to compel Plaintiffs to individually arbitrate their claims against Defendant.  The Court will finish by analyzing whether equitable estoppel permits Defendant as a non-signatory to the AA to compel Plaintiffs into individual arbitration.

## II.   KESTREL'S MOTION TO INTERVENE

Federal Rule of Civil Procedure 24 recognizes two types of intervention: intervention as of right under Rule 24(a) and permissive intervention under Rule 24(b).  The Court recommends that Kestrel be permitted to intervene on both grounds.

### A.   Rule 24(a) Intervention of Right

"A nonparty seeking to intervene as of right must establish (1) timeliness, (2) an interest relating to the property or transaction that is the subject of the action, (3) the potential impairment of that interest, and (4) inadequate representation by existing parties."  *Kane Cty., Utah v. United States*, 928 F.3d 877, 889 (10th Cir. 2019) (citing *W. Energy All. v. Zinke*, 877 F.3d 1157, 1164 (10th Cir. 2017)); *see also* Fed. R. Civ. P. 24(a)(2) (same).  The Tenth Circuit takes a "liberal

---

who can actually pay the bill, [Defendant] is better situated than is Kestrel."  *Id.*  Counsel went on to deny that the AA played any role whatsoever in his decision to omit any mention of Kestrel from the Complaint, likening the role that Kestrel performed here as similar to a "paycheck processing company."  *Id.* at 50-51.  It is enough to say that – *but for* the AA – the Court has no doubt that Plaintiffs would have sued Defendant *and* Kestrel and made similar allegations against both.

approach to intervention and thus favors the granting of motions to intervene." *Zinke*, 877 F.3d at 1164 (citing *Coal. of Ariz./N.M. Ctys. for Stable Econ. Growth v. Dep't of Interior*, 100 F.3d 837, 841 (10th Cir. 1996)).

At the outset, the Court notes that Plaintiffs do not challenge the timeliness of Kestrel's MTI.  Not only was Plaintiffs' response silent on the topic, Plaintiffs' counsel confirmed at oral argument that Plaintiffs were not disputing the timeliness with which Kestrel filed its motion.  *See* Tr. at 100.  Furthermore, the Court notes that Kestrel filed its MTI approximately three months after this lawsuit was filed, which was before discovery commenced, before a pretrial schedule was imposed, and before any meaningful hearings were held.  Consequently, in addition to Plaintiffs' concession, the Court finds the MTI timely as a matter of law.

### 1.   *Kestrel has interests that could be adversely affected by this litigation*[4]

"Whether an applicant has an interest sufficient to warrant intervention as a matter of right is a highly fact-specific determination, and the interest test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Barnes v. Sec. Life of Denver Ins. Co.*, 945 F.3d 1112, 1121 (10th Cir. 2019) (quoting *Kane Cty.*, 928 F.3d at 889).  The interest claimed in the litigation must be "direct, substantial, and legally protectable." *Id*.  But the "threshold for finding the requisite legally protectable interest is not high." *Am. Ass'n of People with Disabilities v. Herrera*, 257 F.R.D. 236, 246 (D.N.M. 2008).

Kestrel identifies four protectable interests: (1) enforcing Plaintiffs' arbitration agreement (and class action waiver), (2) protecting its business mode1 and pay structure, (3) defending its

---

[4] Because of the close inter-relationship between the elements of whether Kestrel has an interest in the "property or transaction that is the subject of the action" and whether that interest would be impaired, the Court will address them together.

position as Plaintiffs' sole or joint employer, and (4) limiting its financial exposure occasioned by the indemnity provision in its MSA with Defendant.  Kestrel's MTI at 7.  In Kestrel's view, Plaintiffs' claims against Defendant impact each of these interests, and proceeding without Kestrel being heard "places th[ese] interest[s] at risk."  *Id.* at 9.  Kestrel also emphasizes that, at this stage, the Court need not assess the merits of whether an alleged interest is impaired because such an impairment may be "contingent upon the outcome of [] litigation."  Reply 6, ECF 54 (quoting *Kane Cty.*, 928 F.3d at 891).

Plaintiffs counter that Kestrel's arbitration agreement does not affect their claims against Defendant and Kestrel therefore lacks a valid interest in the current litigation.  Resp. Kestrel's MTI at 3-4.  Plaintiffs also argue that Kestrel's business practices – providing employees to Defendant through the MSA – and any interest in protecting this practice is purely economic in nature and thus insufficient to support intervention.  *Id.* at 5.  Plaintiffs allege that "the sole question before this Court [] is whether [Defendant] owes overtime wages under the FLSA and NMMWA," and not Kestrel.  *Id.* at 6.  Plaintiffs emphasize that no damages can be imposed against Kestrel in this suit, an adverse judgment against Defendant will not create a res judicata effect against Kestrel, and any indemnification dispute between Defendant and Kestrel can be resolved in separate litigation.  *Id.* at 6-7.

Because intervention is a fact-dependent inquiry, the Court will set forth its understanding of the relevant facts as each side sees them, beginning with Defendant and Kestrel.[5]  The Court understands their version of the relevant facts to be as follows: (1) Plaintiffs were W-2 employees solely of Kestrel; (2) the human resources interaction that led to Plaintiffs' hiring occurred solely

---

[5] None of the parties requested an evidentiary hearing or objected to factual assertions made in writing or at oral argument.  Consequently, the Court's understanding of the facts is based on its amalgamation of factual allegations in Plaintiffs' Complaint, Defendant's Amended Answer, the briefing and exhibits associated with the three motions before the Court, and representations made by counsel during oral argument.

with Kestrel; (3) all personnel and tax records regarding Plaintiffs' employment were created and kept solely by Kestrel and reflect only Kestrel as Plaintiffs' employer; (4) Plaintiffs' AA was solely between themselves and Kestrel; (5) Plaintiffs submitted their pay sheets solely to Kestrel; (6) Plaintiffs received compensation for their services solely from Kestrel in accordance with Kestrel's pay policies and personnel management structure; (7) Plaintiffs had no written or oral agreement of any kind with Defendant; (8) the MSA explicitly contemplated that Plaintiffs were solely Kestrel's employees and not Defendant's; and (9) Defendant and Kestrel are separate business entities, entirely independent of each other, with no common ownership or management, and they negotiated their MSA at arm's length.

Plaintiffs, on the other hand, see the relevant facts very differently.  They allege that they worked for Defendant, they were an integral part of Defendant's operations, they applied Defendant's techniques and procedures, they conformed to Defendant's standards, and they were supervised, scheduled, and assigned by Defendant's employees.  *See* Cmplt. ¶¶ 20-28.  Plaintiffs further allege that they were neither salaried nor exempt employees, and therefore Defendant's refusal to pay them overtime pay for the substantial overtime labor they performed violated federal and state law.  *See id.* ¶¶ 30-49.[6]

Whatever else can be said of the disparate manner in which the parties view the relevant facts, this much is clear:  Kestrel has an interest in this litigation despite Plaintiffs strategically omitting any mention of its name in the Complaint.  First, seeking to vindicate its AA with Plaintiffs is a legitimate interest for Kestrel to protect.  As a signatory to that AA – indeed, as its

---

[6] Although Plaintiffs' Complaint is silent – and, no doubt, strategically so – on Kestrel and its indispensable role in the employment transaction at the heart of this lawsuit, Defendant certainly has not been quiet on the subject.  In its Amended Answer, Defendant denied ever being either Plaintiffs' employer and instead identified Kestrel as their sole employer.  *See* ECF 16 ¶ 2.  Indeed, Defendant mentioned Kestrel at least *eighteen* times in its Amended Answer. And for its part, Kestrel *concedes* that it employed the Plaintiffs.

sole drafter – Kestrel has an interest in pursuing what it views as the benefit of its bargain.  Denying Kestrel the ability to intervene and – at the very least – make the argument that its AA be honored by its former employees is a result that Rule 24(a) is designed to prevent.

Just as important, the "transaction" (using Rule 24(a)'s term) that lies at the heart of Plaintiffs' Complaint is the employment relationship they allege they had with Defendant. Although Plaintiffs bobbed and weaved around it in their Complaint, their *sub silentio* employment relationship (if any) with Defendant did not exist independent of their overt and documented employment relationship with Kestrel.  Indeed, neither Plaintiff would have stepped foot onto Defendant's property or examined their first pipeline weld or inch of pipeline coating if they had not already been hired by Kestrel.  And they would not have been hired by Kestrel if they had not entered into the AA with Kestrel.

Furthermore, Plaintiffs' criticism about what they were – and were not – paid is a criticism of a pay structure imposed upon them by Kestrel.  Plaintiffs' contentions about whether they were "exempt" or "non-exempt" under wage-and-hour laws relate just as much if not more to Kestrel's personnel management structure as to Defendant's.  Whether Plaintiffs agree or not, this lawsuit is every bit the full-scale assault on Kestrel's business model as it is on Defendant's.  If at the conclusion of this litigation Defendant is found liable, Kestrel will face two independent pressures: (1) the pressure brought on by the very real possibility of having to indemnify Defendant for its defense costs and the judgment, and (2) the pressure associated with knowing that *its* pay practice and *its* personnel structure were found to have violated federal and/or New Mexico wage-and-hour laws.  With threats like that to Kestrel's financial security and its business operations model, denying Kestrel a podium in this debate is a result once again that Rule 24(a) is designed to prevent.

None of the arguments advanced by Plaintiffs dissuade the Court from recommending that intervention be permitted.  For example, Plaintiffs' contention that, as their complaint is pled, no damages can be imposed on Kestrel is good only as far as it goes.  It is true that if the Court were to deny intervention to Kestrel, the doctrines of res judicata and collateral estoppel would likely have no bearing on future lawsuits against Kestrel.[7]  But that is scant consolation for Kestrel.  After all, the MSA's indemnity provision – a demand under which Defendant has *already* made – has the capacity to convert any judgment against Defendant into a liability for Kestrel.  The distinction between paying a judgment against itself or reimbursing a customer for a judgment suffered by the customer makes no difference to Kestrel's bottom line.  And Plaintiffs have not shown the Court that the distinction makes any difference in the law either.  Rather, the prevailing law is to the contrary.  *See Barnes*, 945 F.3d at 1122 (concluding that intervenor had "a financial interest in the proceeding that [was] sufficient to satisfy the minimal burden we have imposed for intervention as of right"); *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 295 F.3d 1111, 1115 (10th Cir. 2002) ("Furthermore, the Tenth Circuit has deemed the *mere threat* of economic injury to be sufficient for granting intervention.") (emphasis added); *San Juan Cty., Utah*, 503 F.3d at 1203 ("Although the intervenor cannot rely on an interest that is wholly remote and speculative, the intervention may be based on an interest that is contingent upon the outcome of the litigation.").

The Court similarly rejects Plaintiffs' assertion that Kestrel's interest in vindicating its business model is insufficient because it is purely economic.  As their sole support for that position, Plaintiffs cite *Statewide Masonry v. Anderson*, 511 F. App'x 801, 804 (10th Cir. 2013) (unpublished) for the proposition that "a mere economic interest is not enough" to permit

---

[7] The Court pauses to observe that res judicata is not the standard for intervention.  *See Barnes*, 945 F.3d at 1123 (10th Cir. 2019) (holding that a court "may consider any significant legal effect in the applicant's interest and [is] not restricted to a rigid res judicata test" (citation omitted)).

intervention.  Resp. Kestrel's MTI 5.  But Plaintiffs assign that case more weight than it can bear,

for that case actually held:

> Addressing joinder and intervention, many courts loosely say that a mere economic interest is not enough to warrant inclusion of a nonparty. *Flying J, Inc. v. Van Hollen*, 578 F.3d 569, 571 (7th Cir. 2009); *see also Wolfsen Land & Cattle Co. v. Pac. Coast Fed'n of Fishermen's Ass'ns*, 695 F.3d 1310, 1315 (Fed. Cir. 2012); *Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 366 (3d Cir. 1995).  [T]hat is a confusing formulation—most civil litigation is based on nothing more than an economic interest.  *Flying J, Inc.*, 578 F.3d at 571. **Indeed, this circuit recognizes that an economic interest can support intervention**, *see United States v. Albert Inv. Co.*, 585 F.3d 1386, 1396 (10th Cir. 2009), though, of course, practical judgment must be applied in determining whether the strength of the interest and the potential risk of injury to that interest justify intervention, *id.* at 1392 (quoting *San Juan Cnty., Utah v. United States*, 503 F.3d 1163, 1199 (10th Cir. 2007) (en banc)). But all that the [other courts] mean is that the fact that you might anticipate a benefit from a judgment in favor of one of the parties to a lawsuit—maybe you're a creditor of one of them—does not entitle you to intervene in their suit.  *Flying J, Inc.*, 578 F.3d at 571.

*Statewide Masonry*, 511 F. App'x at 804-05 (emphasis added) (internal quotation marks and

parentheticals omitted) (brackets in original).  Consequently, because of the specter of potential

indemnification, and because of the threat this lawsuit poses to Kestrel's business model, the Court

finds that Kestrel has a sufficiently direct economic interest in this case and impairment of its

"interest is possible if intervention is denied."  *Barnes*, 945 F.3d at 1123.

### 2.  *Defendant's and Kestrel's interests potentially diverge*

To establish this element, Kestrel must show that Defendant may not adequately represent

its interest.  "This burden is 'minimal,' and 'it is enough to show that the representation 'may be'

inadequate.'"  *Kane*, 928 F.3d at 892 (quoting *Nat. Res. Def. Council v. U.S. Nuclear Regulatory

Comm'n*, 578 F.2d 1341, 1345 (10th Cir. 1978).  "The possibility of divergence need not be great

in order to satisfy th[is] burden.  An intervenor need only show the *possibility* of inadequate

representation.  Only when the objective of the applicant for intervention is identical to that of one

of the parties is representation considered to be adequate." *Barnes*, 945 F.3d at 1124 (emphasis in original) (internal quotation marks and citations omitted).

The Court need not labor long over this element. The indemnification provision in the MSA and Defendant's demand for indemnity create, at the very least, the *possibility* of divergence as between Defendant and Kestrel. Furthermore, if Defendant is unsuccessful in compelling Plaintiffs into individual arbitration, Defendant has forecasted that one of its primary defenses will be to shift onto Kestrel all responsibility for how – and how much – Plaintiffs were paid. And there can be no denying that Defendant is simply not as motivated or equipped to defend Kestrel's employment practices, pay policy, and personnel structure as Kestrel itself is. Although aligned broadly in common cause against Plaintiffs, Defendant and Kestrel do not share identical or mutually symmetrical interests. Their interests in this litigation are potentially divergent enough to satisfy "the 'minimal' burden of establishing a 'possibility' that [Kestrel's] interests will not be adequately represented" by Defendant. *Barnes*, 945 F.3d at 1125.

For these reasons, the Court recommends that Kestrel be permitted to intervene as of right under Rule 24(a).

## B. Rule 24(b) Permissive Intervention

A district court may permit anyone to intervene who "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). In exercising its discretion to permit a party to intervene, "the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." *Tri-State Generation & Transmission Ass'n, Inc. v. New Mexico Pub. Regulation Comm'n*, 787 F.3d 1068, 1074 (10th Cir. 2015) (quoting Fed. R. Civ. P. 24(b)(3)). For the following reasons, the Court finds that Kestrel

has set out sufficient facts to demonstrate that it would have defenses (and counterclaims) in this lawsuit that raise common questions of law and fact.[8]

Kestrel contends that it is entitled to permissive intervention for two primary reasons. MTI at 15. First, Kestrel asserts that it shares in common with Defendant the defense that Plaintiffs should be required to pursue their claims in individual arbitrations as opposed to a class action lawsuit in federal court. *Id*. Kestrel also argues that it shares with Defendant the legal defense that Plaintiffs were properly classified as "exempt" from overtime under the FLSA and NMMWA. *Id.*

In opposing permissive intervention, Plaintiffs lead off by arguing that Kestrel cannot possibly have a claim or defense to assert because neither Plaintiffs nor Defendant have made any claims against Kestrel. Resp. MTI at 12. But that argument fundamentally misapprehends the purpose of intervention. At the risk of stating the obvious, Kestrel is seeking to intervene in this case *precisely because it has not been sued* and, it says, it should have been. Plaintiffs next argue that the question of whether they were properly classified as "exempt" is not the same question as between Kestrel and Defendant, insisting that Defendant cannot delegate to Kestrel its own independent responsibility to comply with wage-and-hour laws. *Id*. (citation omitted). The Court disagrees. After all, the root of the question – whether Plaintiffs were properly classified – is the same whether that question is posed to Kestrel or to Defendant.[9]

---

[8] Kestrel's proposed counterclaims request a declaratory judgment that Plaintiffs' FLSA and NMMWA claims fall within the scope of its AA. *See* MTI, Ex. 1 at 22-24. Like the arbitration defense, these counterclaims involve the very same common questions of law and fact at issue in the instant case.

[9] Both Kestrel and Plaintiffs also discuss what might happen if Defendant were to file a third-party claim against Kestrel. *See* MTI at 15-16; Resp. at 13-14. Since that has not occurred in this case, and might never occur, the Court elects not to join in the speculation.

Plaintiffs also point out that Kestrel's request for permissive intervention is silent on why its participation would not "unduly delay or prejudice the adjudication of the original parties' rights." *Id.* (citing Fed. R. Civ. P. 24(b)(3)).  While that criticism is technically accurate, Plaintiffs offer the Court no meaningful insight as to why any delay or prejudice that Plaintiffs might suffer would be "undue."  Plaintiffs instead complain that "Kestrel's attempt to intervene is merely procedural gamesmanship." *Id.* at 14.  Putting the irony of that complaint to the side for now, it is enough for the Court to say that it finds nothing untoward or unprincipled about Kestrel's attempt to avail itself of the relief offered under Rule 24(b).  Instead, the inextricable and indispensable role that Kestrel played in the factual scenario that gave rise to this lawsuit, coupled with the commonality of claims and defenses it would have with respect to the parties to this lawsuit, leads the Court to agree that "allowing [Kestrel] to intervene adds value and significantly advances the full and complete development of the factual and legal issues raised in the underlying action." MTI, Ex. 3 (*Snow v. Silver Creek Midstream Holdings, LLC*, No. 2:19-cv-241-ABJ, ECF 30 at 10* (D. Wyo. Apr. 14, 2020)).  Kestrel's intervention will also not cause undue delay.  The Court has already delayed crafting a case schedule and stayed all discovery pending the outcome of Defendant's Motion to Compel Arbitration.  *See* ECF 47 (Order Staying Case).  Kestrel has set out sufficient facts that demonstrate its defenses (and counterclaims) raise common questions of law and fact.  Kestrel's intervention has not and will not unduly take any pace off the litigation.

In sum, Kestrel has met its burden and the Court recommends that Kestrel alternatively be permitted to intervene under Rule 24(b).

Before ending its discussion of Kestrel's MTI, the Court observes that there is a growing body of intervention jurisprudence among district courts in similar cases, with the trend decidedly in favor of granting intervention.  *See Altenhofen v. S. Star Cent. Gas Pipeline, Inc.*, No. 4:20CV-

00030-JHM, 2020 WL 3547947, at *1 (W.D. Ky. June 30, 2020) (intervention granted to staffing agency that employed plaintiffs pursuant to arbitration agreements, but which was not named in FLSA class action) (plaintiffs' counsel include Plaintiffs' counsel in instant action); *Ferrell v. SemGroup Corporation, et al.*, No. 4:19-CV-610-GKF-JFJ, ECF 63 (N.D. Ok. June 12, 2020) (same) (counsel again overlap); *Robertson v. Enbridge (U.S.) Inc.*, No. 2:19-CV-1080, 2020 WL 2104911, at *1 (W.D. Pa. May 1, 2020) (same) (counsel again overlap);   *Snow v. Silver Creek Midstream Holdings, LLC*, No. 2:19-cv-241-ABJ, ECF 30 at *10 (D. Wyo. Apr. 14, 2020)) (same) (counsel again overlap).  While none of these decisions is any way binding on this Court, they nonetheless illuminate its path and the Court finds their common reasoning to be persuasive.

For the foregoing reasons, the Court recommends that Kestrel's MTI be granted, both with respect to intervention as of right and permissive intervention.

## III.   KESTREL'S MOTION TO COMPEL ARBITRATION

If allowed to intervene, Kestrel seeks to compel Plaintiffs to arbitrate their claims and to do so in individual, not collective, actions.  As set forth *infra*, Kestrel argues that the plain language of the AA extends to Plaintiffs' claims against Defendant.  Kestrel contends that the AA required Plaintiffs to arbitrate *all* "claims" or "controversies" arising out of their employment, irrespective of whether Plaintiffs brought them against Kestrel or anyone else.  Because Plaintiffs' wage-and-hour claims against Defendant arose out of their employment with Kestrel, Kestrel urges the Court to compel Plaintiffs to honor their promises and arbitrate the claims they've brought here.  Kestrel also asserts that the class action waiver included in the AA bars Plaintiffs from engaging in any class or collective action against anyone, whether in court or in arbitration.  In response, Plaintiffs contend that they agreed to arbitrate only claims or controversies they might have against Kestrel (and the other entities and persons named in the AA) and, since they haven't sued Kestrel, there

14

are no claims to arbitrate.  Plaintiffs insist that they never agreed to arbitrate claims with *Defendant* and their AA with Kestrel does not address and does not apply to their claims against Defendant.

## A.  Governing Law[10]

The Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA") makes manifest a strong policy preference in favor of arbitration.  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).  The FAA reflects "both a liberal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).  Consequently, "courts must place arbitration agreements on equal footing with other contracts," *id.*, and "rigorously enforce arbitration agreements according to their terms . . ., including terms that specify *with whom* [the parties] choose to arbitrate their disputes[.]"  *American Exp. Co. v. Italian Colors Restaurant*, 570 U.S. 228, 233 (2013) (internal citations and quotations omitted) (emphasis and brackets in original).

Under the FAA, a court may refuse to enforce an arbitration agreement only when the non-moving party presents "well supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds for the revocation of any contract."  *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 627 (1985).  "Like other contracts . . . [arbitration agreements] may be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability."  *Laurich v. Red Lobster Rests., LLC*, 295 F. Supp. 3d 1186, 1205-06 (D.N.M. 2017) (internal citations and quotes omitted) (alterations in original).[11]  Courts generally resolve doubts concerning the scope of arbitrable

---

[10] Because contract interpretation is governed by principles of state law, the Court ordinarily would undertake a conflict of law analysis to determine which state's law to apply.  With respect to Kestrel's MTC, however, there is no reason for the Court to decide that question because both parties – Kestrel and Plaintiffs – agree that the AA would be analyzed the same under New Mexico or Texas law.  *See* Amend. Resp. Kestrel's MTC at 13; Kestrel's Reply Amend. Resp. 1-2.  Consequently, at least with respect to this motion, the Court need not decide the choice of law question.

[11] In this case, Plaintiffs do not assert that the AA should be voided by fraud, duress, or unconscionability.  Indeed, at

issues in favor of arbitration. *See Belknap v. Iasis* Healthcare, 844 F.3d 1272, 1281 (10th Cir. 2017). Related to this presumption of arbitrability is the proposition that arbitration clauses should be construed broadly wherever possible. *See Armijo v. Prudential Ins. Co. of Am.*, 72 F.3d 793, 799 (10th Cir. 1995).

But other general rules apply with equal force, chief among them that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986). "[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp.*, 473 U.S. at 626; *see also Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1286-87 (10th Cir. 1997) (whether an agreement to arbitrate exists at all "is a threshold matter which must be established before the FAA can be invoked."). "[T]o determine whether a party has agreed to arbitrate a dispute, [the Tenth Circuit] appl[ies] ordinary state-law principles that govern the formation of contracts." *Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1304 (10th Cir. 2017) (quoting *Walker v. BuildDirect.com Techs., Inc.*, 733 F.3d 1001, 1004 (10th Cir. 2013)).

The language of the contract "defines the scope of disputes subject to arbitration." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 282 (2002). Courts "enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989) (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (the FAA "was designed 'to make arbitration

---

oral argument, their counsel conceded that the AA – as it relates to claims between Plaintiffs and Kestrel – is valid. Tr. at 122-23 (Burch: "[Well, let me just put it like this. If Bock had sued Kestrel, and Kestrel showed up and said we have to go to arbitration, we would be going to arbitration."). Instead, Plaintiffs anchor their opposition to Kestrel's motion around the premise that Plaintiffs did not agree to arbitrate *anything* with Defendant Salt Creek. In other words, Plaintiffs deny the existence of any arbitration agreement with *Defendant*.

agreements as enforceable as other contracts, but not more so'").  Importantly, the Tenth Circuit employs "the well-accepted rule that ambiguities in contracts [including arbitration provisions] are construed against the drafter."  *Dumais v. American Golf Corp.*, 299 F.3d 1216, 1219 (10th Cir. 2002) (citation omitted).

In deciding whether a particular dispute falls within the scope of an arbitration agreement, the Tenth Circuit uses a three-part test:

> First, recognizing there is some range in the breadth of arbitration clauses, a court should classify the particular clause as either broad or narrow. Next, if reviewing a narrow clause, the court must determine whether the dispute is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause. *Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview. Where the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it.*

*Sanchez v. Nitro-Lift Techs., L.L.C.*, 762 F.3d 1139, 1146 (10th Cir. 2014) (emphasis in original) (citation omitted).

In New Mexico:

> When a broad and general arbitration clause is used . . . the court should be very reluctant to interpose itself between the parties and the arbitration upon which they have agreed. *When the parties agree to arbitrate any potential claims or disputes arising out of their relationships by contract or otherwise, the arbitration agreement will be given broad interpretation unless the parties themselves limit arbitration to specific areas or matters. Barring such limiting language*, the courts only decide the threshold question of whether there is an agreement to arbitrate. If so, the court should order arbitration. If not, arbitration should be refused.

*K.L. House Constr. Co. v. City of Albuquerque*, 1978-NMSC-025,  ¶  8, 91 N.M. 492, 576 P.2d 752, 754 (emphasis added).  To determine whether the contract limits the scope, a court must deduce the intent of the parties from the plain language of the agreement.  *ConocoPhillips Co. v. Lyons*, 2013-NMSC-009, ¶ 23, 299 P.3d 844, 852 ("The purpose, meaning and intent of the parties

to a contract is [sic] to be deduced from the language employed by them; and where such language is not ambiguous, it is conclusive." quoting *Cont'l Potash, Inc. v. Freeport–McMoran, Inc.*, 115 N.M. 690, 704, 858 P.2d 66, 80 (1993)).  "As a general rule, the words employed will be assigned their ordinary meaning unless it is shown that the parties used them in a different sense." *Levenson v. Mobley*, 1987-NMSC-102, ¶ 8, 106 N.M. 399, 402, 744 P.2d 174, 177.  "A contract must be construed as a harmonious whole, and every word or phrase must be given meaning and significance according to its importance in the context of the whole contract." *Bank of New Mexico v. Sholer*, 102 N.M. 78, 79, 691 P.2d 465, 466 (N.M. 1984) (citing *Brown v. American Bank of Commerce*, 79 N.M. 222, 441 P.2d 751 (1968)).

### B. The Arbitration Agreement[12]

The parties agree that whether Plaintiffs' claims against Defendant are subject to the AA depends on the interpretation of the very first paragraph of the AA, which provides:

> This Mutual Arbitration Agreement ("Agreement'') is between me and Kestrel Field Services, Inc., formerly Kestrel Engineering, Inc. ("Company").
>
> **1.     MUTUAL ARBITRATION AGREEMENT**. The Company and I mutually agree and contract to resolve by arbitration all past, present, or future *claims or controversies*, including, but not limited to, claims arising out of or related to my application for employment, employment, or termination of my employment that the Company may have against me or I may have against: (i) the Company or its subsidiaries or affiliated entities ("Kestrel Entities"): (ii) Kestrel Entities officers, directors, employees, or agents in their capacity as such or otherwise: (iii) Kestrel Entities' benefit plans or the plans' sponsors, fiduciaries, administrators, affiliates, and agents, and/or (iii) all of their successors and assigns. All *disputes* covered by this Agreement will be decided by an arbitrator through individual arbitration, not by way of court or jury trial.

---

[12] As Kestrel makes clear in its briefing, Kestrel entered into two virtually identical MSAs, one with Defendant Salt Creek Midstream LLC and another with one of Defendant's affiliates, SCM Crude LLC.  See Kestrel's MTC at 2 n.3. Since the MSAs are otherwise identical, however, the Court will not distinguish between them.  Further, because the arbitration agreements signed by Plaintiffs Bock and Rice were identical in every important respect, the Court will refer to the agreements as a singular document, "the AA," rather than, for example, "the Rice AA" or the "Bock AA."

Kestrel's MTC Ex. B-1 (emphasis added).

### C. Parties' Primary Arguments

Reduced to its essence, Kestrel's position is that the phrase "all . . . claims or controversies, including, but not limited to," is elastic and expansive enough to also apply to lawsuits against *its customers*.  Kestrel's MTC at 9-12.  In advancing this position, Kestrel urges the Court to divine the difference between "claim" and "controversy."  Although Kestrel concedes that this paragraph "limits the agreement to *claims* against certain parties," it insists that there is no such limitation for "*controversies*."  *Id.* at 9 (emphasis added) (citing *Bank of New Mexico v. Sholer*, 691 P.2d 465, 466 (N.M. 1984)).  Relying on its interpretation of definitions provided by Black's Law Dictionary, Kestrel submits that "controversy" and "dispute," as used in the AA, "are synonymous and both refer to the broader context that may give rise to a particular lawsuit or justiciable dispute rather than simply claims against particular parties."  *Id.* at 10 (internal quotations omitted).  Kestrel then endeavors to leverage those dictionary definitions to support its position that Plaintiffs' lawsuit against its customer is covered by the AA because it "is a dispute *that involves* Plaintiffs and Kestrel . . . and is a dispute that arises out of Plaintiffs' respective employment relationship[s] with Kestrel."  *Id.* (emphasis added).[13]

Plaintiffs respond that Section 1 limits the AA's applicability to the signatories and other parties explicitly mentioned: "(i) the Company or its subsidiaries or affiliated entities ("Kestrel Entities"): (ii) Kestrel Entities officers, directors, employees, or agents in their capacity as such or otherwise: (iii) Kestrel Entities' benefit plans or the plans' sponsors, fiduciaries, administrators,

---

[13] Kestrel explains the difference between "narrow" and "broad" arbitration agreements and urges the Court to find the one in this case to be broad.  Kestrel's MTC at 8.  The significance of such a finding, says Kestrel, relates to the presumption of arbitrability:  the more expansive the language used in the agreement, the broader the agreement is. *Id.*  For the sake of this discussion, the Court assumes that the AA is of the "broad" variety.  Nonetheless, as the Court will explain, the AA is not so broad as to reach claims that are plainly beyond the scope of the agreement.

affiliates, and agents, and/or (iii) all of their successors and assigns."  Resp. Kestrel's MTC 7. Plaintiffs also urge the Court to reject Kestrel's reading that (1) "claims," "controversies," and "disputes" are not synonymous and (2) the "claims arising out of" language broadens the entire agreement.  *Id.*  9-11.  Lastly, Plaintiffs assert that *Snow v. Silver Creek Midstream Holdings, LLC*, No. 2:19-cv-241-ABJ (D. Wyo. Apr. 14, 2020) should not persuade this Court to compel arbitration based on the plain language of the AA.  Rather, Plaintiffs believe that *Reeves v. Enter. Prod. Partners, LP*, 2020 WL 616166, at *1 (N.D. Okla. Feb. 10, 2020) is a better choice to guide this Court's decision.[14]

### D.  Analysis

For the following reasons, the Court recommends that the AA be interpreted so as *not* to apply to Plaintiffs' claims against Defendant.  These reasons all share the same theme, which is that the AA – as interpreted through the use of ordinary tools of contract interpretation – would not have put the objective reader on notice that claims, controversies, or disputes against Kestrel's *customers* fell within the scope of the AA.

The Court will begin with the obvious:  the AA is *completely silent* on the topic of Kestrel's customers.  But it is not silent on its application to other entities and individuals.  The AA explicitly applies to any claims that Plaintiffs may have against "(i) the Company or its subsidiaries or affiliated entities ('Kestrel Entities'): (ii) Kestrel Entities['] officers, directors, employees, or agents in their capacity as such or otherwise: (iii) Kestrel Entities' benefit plans or the plans' sponsors, fiduciaries, administrators, affiliates, and agents, and/or (iii) all of their successors and assigns."  Kestrel's MTC, Ex. B-1 at 1.  In enumerating this diverse list of targets of potential legal

---

[14] *Reeves* offers little guidance on Kestrel's MTC because neither third-party beneficiary status nor equitable estoppel is at issue in Kestrel's MTC.  In addition, *Reeves* wrestled with questions of Oklahoma law.  Consequently, the Court does not consider the *Reeves* decision relevant here.

action, Kestrel quite effectively put any signatory to the AA on notice that claims against any person or entity on that list would be subject to arbitration.  And with just a very few keystrokes, Kestrel could have added its *customers* to this list and accorded them the same protection, yet Kestrel for whatever reason chose not to do so.[15]

That silence is thunderous given Kestrel's business model.  It is worth remembering that Kestrel exists for the purpose of deploying its own personnel with specialized skills to the job sites of its customers.  So far as the Court understands it, Kestrel is a staffing company that generates revenue *only* by surging its own employees to fill the gaps in the workforces of its customers.  In other words, if Kestrel's employees are not performing services on the pipeline or property of one of its customers, then neither its employees nor Kestrel is getting paid.  Consequently, with this as its business model, Kestrel necessarily understood there was at the very least *the possibility* of legal disputes arising between its employees and its customers.  Yet Kestrel – the sole drafter of its AA – elected for whatever reason not to explicitly include its customers in the AA.[16]

With respect to Kestrel's primary argument that claims against its customers are implicit in the AA's use of the word "controversy," the Court is skeptical.  Black's Law Dictionary (11th ed. 2019) provides the following definitions of the three words that are at ground zero of this debate:

---

[15] At oral argument, in response to the Court's question as to why the AA did not expressly extend to Kestrel's customers or clients, Kestrel's counsel offered: "My guess is two things.  Number one is probably it was not – it wasn't – it was an oversight probably, didn't think of that possibility that this would happen.  And more likely, that they thought the [']claims [or] controversies included, but not limited to['] [covered] in such situation, because if it arose out of employment [with] Kestrel, it would be covered.  And they probably just didn't think of this possibility."  Tr. at 112.  Kestrel's counsel also assured the Court that Kestrel had already amended its AA going forward, tr. at 107-08, no doubt to cure the vulnerabilities identified in the instant lawsuit.

[16] For an example of an oilfield-related staffing company expressly including its customers in an arbitration agreement, *see Goldsborough v. Newpark Drilling Fluids, LLC,* No. 2:19-CV-309-KWR-GBW, 2020 WL 619211, at *3-4 (D.N.M. Feb. 10, 2020).

> CLAIM: A demand for money, property, or a legal remedy to which one asserts a right; esp., the part of a complaint in a civil action specifying what relief the plaintiff asks for.

> CONTROVERSY: 1. A disagreement or a dispute, esp. in public. 2. A justiciable dispute.

> DISPUTE: A conflict or controversy, esp. one that has given rise to a particular lawsuit.

As we can see, Black's defines "dispute" in part as a "controversy" and defines "controversy" in part as a "dispute."  Interestingly, as part of its definition of "controversy," Black's defines the related phrase "separable controversy" as "[a] *claim* that is separate and independent from the other *claims* being asserted in a suit."  CONTROVERSY, Black's Law Dictionary (11th ed. 2019) (emphasis added) (separable controversy "is most often associated with the statute that permits an entire case to be removed to federal court if one of the claims, being separate and independent from the others, presents a federal question that is within the jurisdiction of the federal courts."). Thus, at least in some contexts, Black's sometimes uses the words in question to describe each other.  If a reference as revered as Black's Law Dictionary uses "claim," "controversy," and "dispute" as synonyms at various times in various contexts, it is difficult for the Court to accept Kestrel's argument that an ordinary reasonable person should somehow be able to maintain rigid distinctions between those terms when reading the AA.

Furthermore, the Court worries that Kestrel has stretched Black's definition of "controversy" and "dispute" past their literal meaning.  Kestrel contends that those terms "are synonymous and both refer *to the broader context* that may give rise to a particular lawsuit or justiciable dispute *rather than simply claims against particular parties*."  Kestrel's MTC at 10 (internal quotations omitted) (emphasis added).  Kestrel then goes on to offer its own two-prong test: if a "dispute" (1) involves Plaintiffs and Kestrel and (2) arises out of Plaintiffs' employment

relationship with Kestrel, then that dispute comes within the scope of the AA. *Id.* But in so doing, Kestrel elasticizes Black's definitions of "dispute" and "controversy," imagines that they advert to a "broader context" in which a lawsuit has arisen, and engrafts onto the definitions the amorphous term "involves" that appears nowhere in the definitions. It is worth repeating that Black's defines "controversy" in part as a "justiciable dispute." There is nothing in that definition that speaks to the "broader context" in which the dispute has arisen. Similarly, Black's defines "dispute" in part as a "*controversy*, esp. one that has given rise to a particular lawsuit." Again, there is no mention of the "broader context" of anything, only that a "dispute" is often a "controversy" that is of the kind that can be resolved by a court.[17] It is enough to say that Kestrel's adaptation of the definitions of the operative terms – and its invention of its two-prong test – would not be readily obvious to the objective reader of the AA. Kestrel has cited no authority, binding or otherwise, that would permit it to so creatively construe the AA of which it was the sole drafter.

Still another reason counsels the Court to recommend that the AA be held not to apply to Plaintiffs' claims against Defendant: the language used in the agreement overall. Excerpted at the beginning of this discussion, Section 1 exists only in the context of the overall agreement, which itself numbers twelve sections, some of which have subsections. Reading the entire agreement in context, the Court concludes that "claim," "controversy," and "dispute" (and their plurals) are used synonymously and interchangeably in the agreement. The AA features twenty-four uses of the word "claim" or "claims," two uses of "controversy" or "controversies," and ten uses of "dispute" or "disputes." For its part, Section 1 includes the phrase "claims or controversies," then gives

---

[17] Plaintiffs repeatedly invite the Court to rely on *Chelsea Family Pharmacy, PLLC v. Medco Health Sols., Inc.*, 567 F.3d 1191, 1198 n.7 (10th Cir. 2009) for the proposition that the Tenth Circuit discerns no difference between "claim" or "controversy" when used in the context of arbitration agreements. Amend. Resp. 2-3, 8. The Court agrees with Kestrel, however, that the quoted language in *Chelsea* is dicta and neither *Chelsea* nor the case it cited (*P & P Industries, Inc. v. Sutter Corp.,* 179 F.3d 861 (10th Cir. 1999)) engaged in an actual analysis of the etymology of the terms. For that reason, the Court assigns no weight to the *Chelsea* footnote or its reasoning.

examples of "claims" that are covered, and concludes by telling the reader that "[a]ll *disputes* covered by this Agreement will be decided by an arbitrator through individual arbitration, not by way of court or jury trial."  Kestrel's MTC, Ex. B-1 at 1 (emphasis added).

The reader might begin to get confused by Section 1a, entitled "Covered Claims," which employs a consecutive streak of nine uses of "claims" only to shift gears in the last sentence to refer to "disputes."  The confusion might worsen, however, when the reader detects that the AA seems to ascribe different meaning to "disputes" depending on the context.  The last sentence of Section 1a uses the word to describe a legal contest "arising out of or relating to the enforceability, applicability, revocability, formation, or validity of the Agreement or any part of it."  *Id.*  Although that "dispute" is a ripe legal skirmish that demands resolution, it seems different in kind than a "claim" because the resolution of the "dispute" will decide only where and how the "claim" will be resolved (*i.e.* in arbitration or in court).

Section 2 isn't much help.  It is entitled "HOW TO INITIATE ARBITRATION OF COVERED *DISPUTES*," but its first sentence instructs the parties to the AA how and when to arbitrate a "claim."  *Id.* (emphasis added).  This suggests to the reader that the AA is using "dispute" and "claim" as synonyms.  But in its last sentence, Section 2 seems to revert to the other definition of "dispute" by advising that "[t]he arbitrator shall resolve all "disputes" regarding whether a request for arbitration was proper and on time."  *Id.*  As used there, "dispute" refers to a legal issue collateral to a "claim."

Other sections only thicken the plot.  Section 3's Class Action Waiver seems to bounce back to using "dispute" as synonymous with "claim."  Three times that section uses "dispute" to describe a typical lawsuit (naturally thought of as comprised of one or more legal claims) and warns that the AA forbids such "disputes" from proceeding as class or collective actions.  *Id.*

Sections 10 and 12 seem to subscribe to the "dispute"-as-"claim" theory as well.  Section 10 confirms that the parties' "mutual obligations . . . to arbitrate *disputes* provide adequate consideration."  *Id*. at 2 (emphasis added).  And Section 12 confirms that "this is the complete agreement of the parties on the subject of arbitration of *disputes*."  *Id*. (emphasis added).

If the reader hasn't already thrown up his or her hands in confusion, the first sentence of the AA's concluding paragraph announces in bold print and all capital letters that the employee's "decision to continue employment after receipt of this agreement is . . . [his/her] agreement to arbitrate *disputes*."  *Id*. (emphasis added).  In the very next sentence, however, the same paragraph emphasizes that the parties "are giving up our respective rights to a court or jury trial and . . . we are agreeing to arbitrate *claims* covered by this agreement."  *Id*. (emphasis added).

After all of this whip-sawing, although the reader might not suffer from blurred vision and vertigo, he or she certainly should be forgiven for not appreciating the subtle differences between "claim," "controversy," and "dispute" that Kestrel insists are plain and obvious.  The Court suspects that this kind of drafting – which breezily includes terms that are (1) close synonyms, (2) not separately defined, (3) used interchangeably without any apparent rationale, and (4) assigned shifting definitions depending on context – is among the leading reasons why ambiguities in contracts are construed against their drafter.[18]

In sum, the Court agrees with Kestrel's counsel's first "guess" at oral argument about why the AA did not explicitly include Kestrel's customers in the list of entities and individuals within the ambit of Section 1:  "[I]t was an oversight probably, didn't think of that possibility that this

---

[18] Kestrel urges the Court to follow the reasoning and decision in *Snow v. Silver Creek Midstream Holdings, LLC*, No. 2:19-cv-241-ABJ (D. Wyo. Apr. 14, 2020).  *See* ECF 55, Ex. A (attached opinion) and ECF 78, 11-12.  At oral argument, the Court questioned Kestrel's counsel about the *Snow* decision, and the important differences between the arbitration agreements there and here.  Tr. 109:5-114:17.  Since oral argument, the Court again has scrutinized the two arbitration agreements and finds their structure and language to be significantly different.  Those differences deny the Court the ability to ascribe much precedential value to the *Snow* decision on this point.  Whatever features of the *Snow* agreement it might prefer, Kestrel must live with the AA that it drafted.

would happen." Tr. 112:16-18.  Now that "this" has happened – that one of Kestrel's employees has sued one of its customers – Kestrel finds itself having to hunt through the AA it alone drafted for language elastic enough to adapt to a situation it did not contemplate.  In the context of the overall agreement, construed through the objective eyes of a reader applying ordinary meaning to words, Section 1 of the AA cannot fairly be read to apply to claims brought by Kestrel's employees against one of its customers.  By its plain language, that section limits the claims, controversies, and disputes subject to arbitration to be those by and between the signing employee and the list of entities and individuals identified therein.  To say now that the language is malleable enough to apply to lawsuits against its customers – whom Kestrel kept off the list and out of that section – would permit Kestrel to smuggle an elephant through a keyhole, a result the Court believes is not warranted by governing law.  In the final analysis, Kestrel's MTC invites the Court to rewrite the AA and thereby cure what might have been a drafting error, an oversight, a failure to predict the future, some combination of these, or something else altogether.  The Court declines the invitation and urges the presiding judge to do the same.

### E.  The Class Action Waiver

Section 3 of the AA provides:

CLASS ACTION WAIVER. The Company and I waive any right for any dispute to be brought, heard, decided, or arbitrated as a class and/or collective action ("Class Action Waiver"). An arbitrator shall have no authority under this Agreement to hear or arbitrate any class or collective action dispute. Notwithstanding any other provision in this Agreement, this Class Action Waiver shall not be severable from this Agreement in any instance in which a dispute is brought as a class and/or collective action. Notwithstanding any other language in this Agreement, any rules or procedures that may apply by virtue of this Agreement, any arbitration organization rules or procedures that apply, or any amendments and/or modifications to those rules, any claim or assertion that the Class Action Waiver or any part of it is unenforceable, inapplicable, unconscionable, void, or voidable shall be determined only by a court of competent jurisdiction, not an arbitrator.

Kestrel's MTC, Ex. B-1 at 1.

Kestrel contends that this section makes plain that Plaintiffs agreed not to bring any dispute as a collective action, whether in court or in arbitration.  Kestrel's MTC at 12-13.  Kestrel points out that the Class Action Waiver in Section 3 of the AA does not have the limiting language that made the application of Section 1 so complicated and, in the Court's view, so confined.  *Id* at 13. Kestrel emphasizes that Section 3 speaks to "any dispute" without limitation to the parties to that dispute.  *Id*.  Kestrel insists that "even if arbitration is *not* compelled, the class/collective action waiver should be enforced."  *Id.* 13 (emphasis added).

In their initial response brief, Plaintiffs did not address this argument.  *See* ECF 58.  At the hearing, however, in answer to the Court's question as to why Plaintiffs did not respond, their counsel acknowledged that an earlier draft of the response brief had inadvertently been filed and sought permission to file the final draft as Plaintiffs' amended response.  Tr. at 123-25.  Without objection from Kestrel's counsel, the Court permitted Plaintiffs' counsel to do so and permitted Kestrel an opportunity thereafter to amend its reply brief.  *Id.* at 126-27.  In addition to explaining the briefing deficiency, Plaintiffs' counsel offered a preview of his opposition to the Class Action Waiver: "[T]he class action waiver is obviously part and parcel of the arbitration agreement.  It, you know, references *what is proceeding in arbitration*, and therefore, it is by definition defined [sic] *to what happens in arbitration*.  It's *not* a standalone waiver.  It talks about the restrictions on what can be pursued *in arbitration*."  Tr. at 123 (emphasis added).

Plaintiffs filed their amended response the day after oral argument.  *See* ECF 75.  At fourteen pages, this brief was nearly double the length of its earlier iteration.  Stunningly, however, the amended response *still* did not address Kestrel's argument that the Class Action Waiver is independently enforceable apart from the arbitration agreement.  The amended response offers not

a single syllable on the topic.  Given that the Court and counsel *just the day before* discussed the failure of the response to address this separate argument, the Court finds the amended response's failure to do so tantamount to Plaintiffs' forfeiture of the right to further respond.

The Court's Local Rules provide that "[t]he failure of a party to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion." D.N.M.LR-Civ 7.1(b).  Implicit in that rule is that the failure to respond to an argument raised in a motion constitutes consent to grant the motion to the extent associated with that particular argument.  Furthermore, under Tenth Circuit law, failing to respond constitutes waiver. *See, e.g., Cole v. New Mexico*, 58 F. App'x 825, 829 (10th Cir. 2003) (unpublished) (argument waived when not raised in initial response to motion to dismiss); *Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768 (10th Cir. 2001) (unpublished) (plaintiff abandoned claim when failed to respond to arguments made in support of summary judgment).

As the record now stands, Plaintiffs' only opposition to the applicability of the Class Action Waiver was the short and summary response given by their counsel at oral argument.  It does not take the Court much time at all to reject that response because the language of the Class Action Waiver plainly applies to "*any* dispute" that can "be brought, heard, decided, *or arbitrated*[.]" Kestrel's MTD, Ex. B-1 ¶ 3 (emphasis added).  This language clearly contemplates disputes that can be resolved in arbitration *or* a forum other than arbitration, that is, a court of competent jurisdiction.  Furthermore, Kestrel is correct that the Class Action Waiver, unlike the Mutual Arbitration Agreement in Section 1, does not contain any limitation whatsoever on the disputes or the parties to the disputes that fall within its scope.

On this point, the *Snow* decision is quite persuasive.  The two relevant provisions of the *Snow* agreement are as follows:

**1. Mutual Agreement**

This Agreement covers all claims by the Employee against the Company or by Company against the Employee.

**2. Claims Covered**

The Employee and the Company agree to arbitrate all claims that have arisen or will arise out of Employee's employment with or termination from the Company regardless of whether those are claims under common law or under statutory law.

*Snow,* No. 2:19-cv-241-ABJ, ECF 41 at 12.  The court found that:

> The provision under paragraph one is *broad but only to claims Mr. Snow and Applied have against each other*. Paragraph two is broader. *This paragraph is not limited to claims Mr. Snow and Applied have against each other but covers all the claims the parties have arising from Mr. Snow's employment*. In other words, Applied agrees to arbitrate all claims that will arise out of Mr. Snow's employment with it; Mr. Snow agrees to arbitrate all claims that arise out of his employment with Applied. The present case involves a claim that arises out of Mr. Snow's employment with Applied. It is over whether he was improperly denied overtime pay. Applied issued his paychecks. Furthermore, the broad provision under paragraph two provides a presumption in favor of arbitration.

*Id*. (emphasis added).

> In turn, the court held that when:

> Interpreting this agreement as a whole, there is a separate section (paragraph two) specifying which claims are covered. It provides more detail to paragraph one. If paragraph two only included claims Mr. Snow and Applied had against each other, it would be superfluous to paragraph one and mean nothing. *Paragraph one specifies that any claims the parties have against each other will go to arbitration. Paragraph two says that any claims the parties have regarding Mr. Snow's employment will proceed to arbitration*. These provisions read consistently. It is clear the intent was to cover any claims the parties had against each other and claims they had regarding Mr. Snow's employment. Mr. Snow's claim against Silver Creek falls within the scope of the arbitration agreement.

*Id*. at 15.  The class action waiver of Section 3 is directly analogous to *Snow*'s Paragraph 2.  To be sure, paragraph two in *Snow* omitted language that restricted arbitration to "*claims Mr. Snow and Applied have against each other*."  *Id*.  Section 3 of the AA here likewise omits language that restricts claims to Plaintiffs, Kestrel, and the enumerated list of other targets.  *Compare* Kestrel's

MTC, Ex. B-l ‖ 1 ("The Company and I mutually agree and contract to resolve by arbitration all past, present, or future claims or controversies . . . that the Company may have against me or I may have against . . .") with *id*. ‖ 3 ("The Company and I waive any right for any dispute to be brought, heard, decided, or arbitrated as a class and/or collective action").  As with *Snow*, the reader can readily determine that Section 3's class action waiver covers *all* claims, whether brought against Kestrel, the other enumerated targets of section 1, or Defendant.  And Section 3's waiver likewise applies whether the claims are restricted to arbitration by Section 1 or brought in a court of competent jurisdiction against unenumerated third parties.

Consequently, for the foregoing reasons, the Court recommends that Kestrel's MTC be **DENIED** as it pertains to Kestrel's request that Plaintiffs be compelled to arbitrate their claims against Defendant.  But the Court further recommends that Kestrel's MTC be **GRANTED** to the extent that it seeks a ruling forbidding Plaintiffs from pursuing their claims against Defendant in a class or collective action.

## IV.   DEFENDANT'S AMENDED MOTION TO COMPEL ARBITRATION

In its amended motion, Defendant seeks an order compelling Plaintiffs to pursue their claims against it in individual arbitration.  Defendant agrees that it is not a signatory to the AA, Def.'s Amend. MTC 5, 7, and does not assert that it is a third-party beneficiary of it either.  Instead, Defendant contends that the Court should compel arbitration solely under the doctrine of equitable estoppel under New Mexico law.  *Id*. at 2, 7-15.  Defendant insists that the only way in which Plaintiffs could prevail on liability is to prove that Defendant and Kestrel were their "joint employers" who together violated federal and state wage-and-hour laws.  *Id*. at 9, 12-13.  And, Defendant says, it is precisely that legal theory – the "substantially interdependent and concerted misconduct" between two employers, one of which is a signatory to an AA – that animates the

New Mexico doctrine of equitable estoppel.  *Id*. at 9-13.  Defendant maintains that equitable estoppel should compel arbitration despite the "artful" manner in which Plaintiffs omitted any reliance on joint employer liability or indeed any reference to Kestrel at all in their Complaint.  *Id.* at 13-15.[19]

Plaintiffs respond in two primary ways.  First, they contend that Texas law – not New Mexico law – should control the debate over the applicability of equitable estoppel to this case.  Resp. Def.'s Amend. MTC at 3.  Because Texas does not recognize equitable estoppel based on a theory of concerted misconduct, the Court cannot apply it here.  Plaintiffs next assert that, even under New Mexico law, Defendant's motion should fail because Plaintiffs have not made any allegations that Defendant engaged in interdependent and concerted misconduct with anyone, much less Kestrel.  *Id*. at 2, 7-9.  Plaintiffs confirm that they have not pled a theory of joint employer liability, are not proceeding on such a theory, have not sued Kestrel, and make no claims against Kestrel.  Instead, Plaintiffs' theory in this lawsuit is one of pure employer liability – that is, Defendant Salt Creek *and no one else* was their employer.  *See* Tr. 77:16-19.  If there is no allegation of joint employer liability, there can be no allegation or inference of "concerted misconduct," and thus New Mexico's doctrine of equitable estoppel does not apply.

**A.  Conflict of Laws**

   *1.  Legal Standard*

In their complaint, Plaintiffs seek relief first under the FLSA.  Compl. At 11.  Generally, "federal choice-of-law principles are used in resolving federal causes of action."  *Ellis v. Liberty*

---

[19] Defendant asserts that New Mexico law should apply.  *See generally* Def.s' MTC; Def.'s Reply 2.  But in the event the Court disagrees and applies Texas law, Defendant maintains that the Texas doctrine of "intertwined claims estoppel" should apply and result in an order compelling Plaintiffs to arbitrate their claims.  Def.'s Reply 9-12.  Because the Court agrees with Defendant that New Mexico law applies, the Court has no occasion to evaluate the applicability of Texas's "intertwined claims estoppel."  The Court further notes that neither party has asserted that this variety of estoppel is available under New Mexico law.

*Life Assurance Co. of Bos.*, No. 19-1074, 2020 WL 2463044, at *8 (10th Cir. May 13, 2020); *see Hislop v. Paltar Petroleum Ltd.*, 2018 WL 5014123, at *5 (D. Colo. Oct. 16, 2018); *United States v. Lindemuth*, 2017 WL 3593226, at *3 (D. Kan. Aug. 21, 2017); *Bd. of Cty. Commissioners of the Cty. of Kay, Oklahoma v. Freeport-McMoran Copper & Gold, Inc.*, 2013 WL 12093009, at *2 (W.D. Okla. Sept. 5, 2013) (unpublished); *Cyprus Amax Minerals Co. v. TCI Pac. Commc'ns, Inc.*, 2012 WL 4006122, at *4 (N.D. Okla. Sept. 12, 2012).   Federal common law applies the Restatement (Second) of Conflicts of Laws.   *See Lindemuth*, 2017 WL 3593226, at *3; *see also Weinman v. McCloskey*, No. 14-CV-00296-CMA-CBS, 2015 WL 1528896, at *5 (D. Colo. Mar. 31, 2015) ("[C]ircuit courts have concluded that a federal common law choice-of-law analysis should be conducted when the issue is a federal question, and . . . courts have relied upon the Restatement (Second) of Conflicts of the Law for the content of federal common law."(quoting *Grand Isle Shipyard, Inc. v. Seacor Marine*, LLC, 589 F.3d 778, 809 (5th Cir. 2009))).

The Restatement (Second) of Conflicts applies the most significant contacts test when, as here, the contract contains no choice of law provision:

> (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

> (2) In the absence of an effective choice of law by the parties [], the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
> (a) the place of contracting,
> (b) the place of negotiation of the contract,
> (c) the place of performance,
> (d) the location of the subject matter of the contract, and
> (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

Restatement (Second) of Conflict of Laws § 188 (1971).   In turn, Section 6 of the Restatement (Second) provides:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
    (a) the needs of the interstate and international systems,
    (b) the relevant policies of the forum,
    (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
    (d) the protection of justified expectations,
    (e) the basic policies underlying the particular field of law,
    (f) certainty, predictability and uniformity of result, and
    (g) ease in the determination and application of the law to be applied.

*Id*. § 6.

### 2. Analysis

There are evidentiary gaps in the record that complicate the evaluation of "contacts" under § 188. For example, the record does not identify in which state Plaintiffs first performed inspection services under their agreement with Kestrel, the percentage of time they performed services in Texas versus New Mexico, or the location of Plaintiffs at the time they were terminated. Nonetheless, the record does contain sufficient information to tip the scales in favor of New Mexico when applying the principles of § 6.

Beginning with an evaluation of Texas's contacts under § 188, the Court observes that: (1) Defendant is headquartered in Houston, (2) the AA requires any arbitration to take place in Harris County, Texas, (3) Kestrel is a corporate citizen of Texas, and (4) Plaintiffs *may have* performed some work in Texas. The Court has not been provided sufficient information, however, to determine whether Texas was the place of contracting or whether and to what extent Plaintiffs performed inspection services in Texas. To be sure, Plaintiffs allege that they accepted employment with Kestrel by commencing employment in Reeves County, Texas. Resp. Def.'s Amend. MTC at 4. But to support that assertion, Plaintiffs merely point to the MSA between

Kestrel and Defendant, which states that Kestrel would provide services "at or near [Defendant's] manufacturing facility in Reeves County, Texas *or at such other facilities owned or operated by [Defendant]*." Resp. Defendant's MTC; ECF 36-2 (MSA) (emphasis added). Consequently, the MSA does little to inform the Court about the location at which Plaintiffs actually commenced work, considering that Defendant also owned and operated facilities in New Mexico. Furthermore, Defendant contends that the employment agreement that Plaintiffs entered into with Kestrel was a bilateral contract considered to have been accepted at the moment that Plaintiffs signed the paperwork, not when they arrived on location to begin performing services. Def.'s Reply 6 n.5. If true, that theory would bring Missouri and Oklahoma – Plaintiffs' states of citizenship – into the analysis too. *Id*. at 4. At bottom, while Texas does have some § 188 contacts with the AA in this case, the extent of those contacts is uncertain.

Although this is a close question, the Court is of the opinion that New Mexico's contacts stand on a more solid footing. Plaintiffs filed their Complaint in New Mexico. *See* Compl. They allege violations of federal and New Mexico law, but do not invoke the statutes of Texas or any other state. *Id*. They avow that a substantial portion of the services they rendered in performance of their agreement with Kestrel was in Eddy and Lea Counties in New Mexico. *Id*. ¶¶ 7, 8. Plaintiffs served Defendant in New Mexico. *See* ECF 6. If it is applicable at all, the AA is just as applicable to Plaintiffs' claims under the New Mexico Minimum Wage Act as it is to their FLSA claims. Under Restatement (Second) § 6, New Mexico surely has an interest in the uniform application of its own NMMWA. Applying anything other than New Mexico law in a case that relies heavily on a New Mexico statute strikes the Court as an odd result. New Mexico similarly has an interest in the New Mexico workers it protects. Indeed, Plaintiffs define the NMMWA class as "[c]urrent and former inspectors employed by or performing work on behalf of

[Defendant] in New Mexico and paid a day-rate without overtime during the past three years." Compl. ¶ 12.  Lastly, the Court notes that New Mexico public policy heavily favors arbitration. *Parrish v. Valero Retail Holdings, Inc.*, 727 F. Supp. 2d 1266, 1281 (D.N.M. 2010) ("Congress, the New Mexico Legislature, and federal and New Mexico courts have expressed a strong public policy favoring arbitration.").

In sum, the Complaint's allegations that Plaintiffs performed a substantial portion of inspection services in Eddy and Lea Counties, the subject matter of the contract (inspection services that are alleged to have substantially occurred in those counties), and New Mexico's relationship under Restatement (Second) §§ 188 and 6 to this dispute warrant the application of New Mexico's contractual interpretation law in this action.

### B.  Equitable Estoppel under New Mexico Law

#### 1.  *Legal Standard*

Under "traditional principles" of state law, a non-signatory may compel arbitration through "assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (quotation omitted).  In New Mexico, "[g]enerally, a non-signatory to an arbitration agreement cannot compel arbitration." *Mulqueen v. Radiology Assocs. of Albuquerque, P.A.,* 2019 WL 1231408, at *6 (N.M. Ct. App. Feb. 4, 2019) (citing *Horanburg v. Felter*, 2004-NMCA-121, ¶ 16, 136 N.M. 435, 99 P.3d 685).  The doctrine of equitable estoppel, however, provides for two circumstances that allow enforcement by a non-signatory: "(1) when a signatory to the agreement must rely on the terms of the agreement in making a claim against a non-signatory; or (2) when a signatory alleges substantial interdependence and concerted misconduct by both another signatory and a non-signatory, making arbitration between signatories meaningless." *Id*. (citing cases); *see*

*also La Frontera Ctr., Inc. v. United Behavioral Health, Inc.,* 268 F. Supp. 3d 1167, 1218 (D.N.M. 2017) ("The Court concludes that the Supreme Court of New Mexico would recognize that a nonsignatory to an arbitration agreement may successfully rely on the doctrine of equitable estoppel to compel arbitration.") (discussing cases).

### 2. Analysis

Defendant relies solely on the second prong of New Mexico's estoppel test, specifically the prong that applies when a signatory makes allegations of "substantial interdependence and concerted misconduct" by another signatory and a non-signatory.  *See* Def.'s Amend. MTC 9-13 and Tr. 37:8-25.[20]  Defendant contends that Plaintiffs' claims against it "necessarily are premised on interdependence between Kestrel and [Defendant]."  Def.'s Amend. MTC at 11.  Defendant posits that "[t]here is *no dispute* that Plaintiffs' claims depend upon findings that Salt Creek is their joint employer with Kestrel[.]"  Def.'s Reply 8 (emphasis added)  Defendant argues that Plaintiffs *concede* that a joint employer relationship is at issue in this case.  *Id.*  And in perhaps its most aggressive position, Defendant insists that "[n]otwithstanding the Complaint, to establish their asserted claims, Plaintiffs *must prove interdependent and concerted misconduct by Salt Creek and Kestrel.*"  *Id.* (emphasis added).[21]

---

[20] At oral argument, the Court quizzed Defendant's counsel about whether Defendant was even asserting an argument under the first prong of the estoppel doctrine (often referred to as "direct benefits estoppel").  Tr. at 37.  The Court's takeaway from that short dialogue is that Defendant is not making the argument.  Furthermore, the Court finds that there is nothing in Plaintiffs' Complaint *that suggests in any way that they are invoking or relying on their employment agreement with Kestrel in making their claims against Defendant.*  To the contrary, Plaintiffs' claims against Defendant arise not from any agreement, but instead from Defendant's obligations under the Fair Labor Standards Act and the New Mexico Minimum Wage Act.

[21] Defendant's counsel persisted in this position at oral argument.  *See, e.g.,* Tr. at 19 (counsel speaking of "the necessarily joint employment allegation *that the Plaintiff is making*") (emphasis added), Tr. at 38 ("[e]very single time he makes those allegations, [Plaintiff] is making allegations of concerted misconduct even if he doesn't name his actual employer by name"), Tr. at 41-42 (counsel confirming Defendant's position is "in order to prove their claims, the Plaintiffs are going to have to show, whether they pled it or not, they're going to have to show that there was concerted misconduct between Salt Creek and Kestrel").

The Court's problems with Defendant's position are fourfold.  First, the Complaint is silent on Kestrel, much less any conduct or misconduct on its part.  In its current form, the Complaint alleges illegal behavior only on the part of a single putative wrongdoer, to wit, Defendant Salt Creek.  As set forth in more detail, that laser-focus on Defendant to the exclusion of any other actor takes this case to a place that no other case in New Mexico has gone before.

Second, at oral argument, Plaintiffs' counsel affirmed that Plaintiffs are *not* proceeding on a theory of joint employer liability.  *See* Tr. 77:16-19.  Instead, their theory of liability is that Defendant was their *sole* employer.  *Id.*  So, as it turns out, in insisting that Plaintiffs *necessarily* are relying on a theory of joint employer liability, Defendant has been punching at a ghost.  However much it may want to, Defendant is not permitted to select the theory or theories of liability that its litigation adversary must pursue.  It is the Plaintiffs, after all, who are the masters of their Complaint.[22]

Third, despite Defendant's insistence that the *only* way that Plaintiffs could possibly prevail in this lawsuit is if they proved joint employer liability, the Court disagrees.  To prove their claims against Defendant, Plaintiffs have to show *inter alia* that Defendant was their "employer" (a finding that requires the factfinder to apply the "economic realities" test), that their positions were not "exempt" from overtime under the appropriate statute(s), that they weren't paid a "salary," that they worked what the law defines as overtime and weren't paid what the law prescribes for

---

[22] The Court pauses here to make an observation.  Having held oral argument and studied Plaintiffs' Complaint, Defendant's First Amended Answer, and the briefing and exhibits associated with the three motions that are the subject matter of this PFRD, the Court is convinced that Plaintiffs drafted their Complaint in the manner they did *solely* to avoid the legal effects of the AA they entered into with Kestrel.  No other explanation makes any sense.  By drafting the Complaint to avoid all reference to the entity that hired them, and now having affirmatively disclaimed the joint employer theory of liability, Plaintiffs have made a high-stakes bet that they can convince the factfinder to conclude that Salt Creek, and not Kestrel, was their *sole* employer.  At least at this relatively early stage of the case, the odds of that bet appear steep indeed, as all objective evidence appears to support a contrary conclusion.  *See, e.g.*, Defendant's MTC at 3-5; Tr. at 58-59; *supra* at 6-7.  Whether Plaintiffs' desire to avoid the AA jeopardizes their chance to prevail at trial – or even to avoid summary judgment – remains to be seen.

overtime work.[23]  *See, e.g., Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33, 81 (1961) ("Whether an employment relationship exists for the purposes of the FLSA turns on the 'economic reality' of the working relationship."); *Aguilar v. Mgmt. & Training Corp.*, 948 F.3d 1270, 1276 (10th Cir. 2020) ("The FLSA requires an employer to pay employees for their work"); *Martin v. Tap Rock Res., LLC*, No. 20-CV-170-WJ-CG, 2020 WL 2129598, at *1 (D.N.M. May 5, 2020) ("The relevant portion of the FLSA requires that [nonexempt] employees who work more than forty hours in a week are compensated at a rate of at least one and one-half times the employee's regular hourly wage." (citing 29 U.S.C. § 207(a)(1))).  Plaintiffs are not required to prove that Defendant acted interdependently with any other entity or individual.  Nor are Plaintiffs required to prove that Kestrel *also* violated the same statutes, even if the evidence might suggest or even prove that it did.  In arguing to the contrary, Defendant misunderstands Plaintiffs' burden of proof.

The Court's final disagreement with Defendant's position deals with the larger legal issue of whether New Mexico's current equitable estoppel doctrine applies to the specific factual posture of this case and, if not, whether the Court believes that the New Mexico Supreme Court would extend the doctrine to reach this case.  On those questions, the Court must answer no.  To date, neither the New Mexico Supreme Court nor the New Mexico Court of Appeals has considered the "interdependent and concerted misconduct" variety of estoppel in a case in which a signatory to

---

[23] In relevant part, the New Mexico Minimum Wage Act states that:

every employer shall pay its employees a minimum wage of $7.50 per hour. N.M. Stat. Ann. § 50–4–22(A). In addition, the Act states that [a]n employee shall not be required to work more than forty hours in any week of seven days, unless the employee is paid one and one-half times the employee's regular hourly rate of pay for all hours worked in excess of forty hours. *Id.* § 50–4–22(D). In order to prevail on this claim, Plaintiffs must show that (a) they worked more than forty hours a week, (b) that [the Hospital] knew or should have known that they did so, and (c) that they were not compensated for the overtime.

*Cruse v. St. Vincent Hosp.*, 729 F. Supp. 2d 1269, 1273 (D.N.M. 2010) (Johnson, J.) (brackets in original) (quoting *Self v. United Parcel Service, Inc.*, 126 N.M. 396, 970 P.2d 582, 589 (1998)).

an AA has made *no allegations* of such misconduct.  As explained below, *every* case (in which arbitration was ordered) that Defendant has cited that is relevant to this question featured the signatory to the AA actually *making* factual allegations of some kind of concerted conduct between another signatory to the AA and at least one non-signatory.  That distinction is crucial in the Court's analysis.

The New Mexico Supreme Court does not appear yet to have addressed the doctrine of equitable estoppel in the arbitration context.  The New Mexico Court of Appeals, on the other hand, first addressed equitable estoppel in the arbitration context in *Horanburg v. Felter,* 2004-NMCA-121,  ¶  2, 136 N.M. 435, 436, 99 P.3d 685, 686.  Similar to here, that court considered, albeit generally, whether a non-signatory to an arbitration agreement could compel a signatory to arbitration.  Horanburg sued her employer for retaliation, negligent hire and retention, constructive discharge, intentional infliction of emotional distress, and violation of the New Mexico Human Rights Act.  *Id*. at 436.  She also asserted claims against a co-worker for assault, battery, and violation of the Human Rights Act.  *Id*.  The district court determined that the arbitration provision in the plaintiff's employment agreement also covered the claims she asserted against a co-worker, who had moved to compel arbitration at the request of the employer "based on the presumption that [the employer] would accept vicarious liability for any award against him").  *Id*. at 436.

The New Mexico Court of Appeals recognized the general rule that "third parties who are not signatories to an arbitration agreement are not bound by the agreement and are not subject to, and cannot compel, arbitration."  *Id*. at 439.  The court noted, however, that exceptions to this rule have been recognized by other courts, including for equitable estoppel.  Based on the facts of the case and for reasons not relevant here, the court ultimately determined that applying equitable estoppel would be inappropriate and declined to adopt the doctrine.  The court emphasized that the

"[p]laintiff's claims against [the co-worker] [were] not alleged to be derived from the agreement

between [the] [p]laintiff and [the employer], and [the co-worker's] alleged conduct, *which has not*

*been determined to be within the course and scope of his employment*, is not the concerted type of

conduct" warranting estoppel.  *Id*. at 440 (emphasis added).  Importantly, the court determined that

the arbitration agreement would not be rendered meaningless even if the co-worker was not

involved in arbitration.  *Id*. ("Despite a level of connectedness, [p]laintiff's claims against [the co-

worker] for assault and battery can be determined separately from her claims against [the

employer].").

The New Mexico Court of Appeals' next encounter with equitable estoppel in the

arbitration context occurred in *Murken v. Suncor Energy, Inc.*, 2005-NMCA-102, 138 N.M. 179,

117 P.3d 985.  In *Murken*, the court addressed the inverse of our scenario – whether a signatory

could compel a non-signatory into arbitration.  *Id*.  There, defendant (and signatory) Merrill Lynch

sought to compel into arbitration a third-party plaintiff, Butler, an ex-corporate officer and non-

signatory.  *Id*.  In declining to enforce the arbitration agreement against Butler, the court held that

the "circumstances of a non-signatory who has engaged in 'substantially interdependent and

concerted misconduct' with a co-defendant who is a party to the arbitration agreement are not

present here."  *Id*. at 183 (citation omitted).  The court continued that Merrill Lynch "argued only

that Butler's claims were intertwined with the same claims, or based on the same underlying facts,

as those of Rendall [a co-defendant ex-officer] (who, Merrill Lynch argued, was a signatory)."  *Id*.

Merrill Lynch did not "argue that Rendall was Butler's agent in the loan transaction giving rise to

the alleged arbitration agreement.  Rendall pledged his own stock, but not Butler's, to Merrill

Lynch as collateral.  Merrill Lynch also does not assert that Butler benefitted from this pledge

agreement between Rendall and Merrill Lynch."  *Id*.  The Court noted that, although substantially

interdependent conduct had been alleged by the shareholder plaintiffs, Merrill Lynch did not claim such conduct and the plaintiff's allegations were not "relevant to the third-party action between Merrill Lynch and Butler."  *Id*.   Thus, the court was "not persuaded that Merrill Lynch and Rendall's agreement to arbitrate would be rendered meaningless if Butler were not involved in the arbitration." *Id*.

The New Mexico Court of Appeals next refereed an equitable estoppel contest in the arbitration context in *Frederick v. Sun 1031, LLC*, 2012-NMCA-118, ¶ 25, 293 P.3d 934, 941. Like *Murken*, *Frederick* arose in the securities context.  There, the plaintiff alleged that an out of state broker-dealer ("Firm"), the Firm's broker ("broker"), and a New Mexico marketing company ("NMMC") violated the New Mexico Securities Act of 1986 by committing fraud and misrepresentation.  The Firm had sold plaintiff three investment packages consisting of real property interests coupled with management services.  Each investment package in turn had a shell company created by the Firm that oversaw and executed each sale.  The purchase agreements that plaintiff entered into with these shell companies included arbitration provisions.

In addition to answering the complaint, the Firm filed a third-party complaint against the shell companies.  Those companies then moved to compel arbitration of all claims in the case, including the plaintiff's claims against the Firm, the Broker, and the NMMC.  The district court held that the underlying purchase agreements that plaintiff entered into with the shell companies covered all claims and compelled all parties into arbitration.  Plaintiff appealed and the New Mexico Court of Appeals reversed.  It first concluded that the shell companies were improper parties and then turned to the question of whether the Firm, a non-signatory, could itself compel arbitration.  In addressing the concerted misconduct exception, the court held that the facts of the case did not support its application.  *Id*. at 942.  Specifically, it stated: "In this case, [plaintiff's]

complaint does not allege any interdependent or concerted misconduct between [the Firm] and [the shell companies]. Even assuming that [the Firm] alleged collusion with [the shell companies] in its third-party complaint, the allegations in [the Firm's] third-party complaint are not relevant to the claims between [the Firm] and [the plaintiff] for purposes of this exception." *Id*. at 943.

Two years later, the New Mexico Court of Appeals again addressed the issue in *Damon v. StrucSure Home Warranty, LLC*, 2014-NMCA-116, ¶ 1, 338 P.3d 123, 123, where it formally adopted equitable estoppel in the arbitration context. There, the "court address[ed] whether a party to a home warranty contract can enforce an arbitration provision contained in that warranty against a nonparty who nevertheless seeks to invoke its benefits." *Id*. The court held that:

> [p]laintiffs, having voluntarily chosen to seek a direct benefit from the warranty by attempting to enforce its terms against [defendant], may not now seek to repudiate one of the warranty's provisions. If [p]laintiffs wished to exempt themselves from the arbitration clause, they could have chosen not to claim and enforce any of the rights under the warranty. However, once [p]laintiffs voluntarily sought to embrace and invoke the benefits created by the warranty, they could not avoid the arbitration provision in the warranty.

*Id*. at 127. Notably, the court distinguished this case from *Murken*:

> [p]laintiffs filed a warranty claim with [defendant] and then later sued [defendant], claiming the warranty issued to the builder and original owners induced them to buy their home and that [defendant] failed to fulfill the duties it owed [p]laintiffs under the warranty. Clearly, [p]laintiffs' case against [defendant] hinges on its asserted rights under the warranty agreement from which they seek to directly benefit. We recognize that [p]laintiffs contend they never signed the arbitration agreement and that, even though they were aware of the warranty before they purchased the home, they did not know it included the arbitration agreement until after they purchased the home. However, unlike the *Murken* plaintiff, [p]laintiffs here voluntarily seek to directly benefit from the warranty by enforcing some of its terms while simultaneously attempting to avoid one of its perceived burdens.

*Id*.

The most recent pronouncement by the New Mexico Court of Appeals about equitable estoppel in the arbitration context came in *Mulqueen v. Radiology Assocs. of Albuquerque*, P.A.,

No. A-1-CA-35852, 2019 WL 1231408, at *5 (N.M. Ct. App. Feb. 4, 2019) (unpublished).  There,

a former employee sued Radiology Associates of Albuquerque ("RAA") and six of its

shareholders, all doctors.  The plaintiff asserted nine counts:

> Count I. Tortious Interference with Contractual Relations Against the Individual
> Defendants; Count II. Oppressive Conduct [and] Breach of Fiduciary Duties by
> Individual Defendants; Count III. Fraud and Misrepresentation by All Defendants;
> Count IV. Breach of Contract, Express or Implied by RAA; Count V. Breach of the
> Implied Covenant of Good Faith and Fair Dealing by RAA; Count VI. Conspiracy
> Among Individual Defendants; Count VII. Prima Facie Tort Against All
> Defendants; Count VIII. Discrimination in Violation of the New Mexico Human
> Rights Act; and Count IX. Retaliation. Plaintiff brought Counts III, VII, VIII, and
> IX against RAA and the Shareholder Defendants (collectively, Defendants), Count
> I, Count II, and Count VI against Shareholder Defendants alone, and Count IV and
> Count V against RAA alone.

*Id*. at *1.  The plaintiff's employment agreement with RAA included an arbitration agreement.

The defendant shareholders moved as non-signatories to that agreement to compel arbitration of

the claims brought against them.

The court of appeals began its analysis by "not[ing] that estoppel is most usual in situations

where the non-signatory is seeking to compel arbitration against the signatory[,] as is the case

here."  *Id*. at *6 (internal quotation and citation omitted).  In determining that the facts satisfied

both estoppel prongs articulated in *Horanburg*,[24] the court first observed that the "[p]laintiff

undoubtedly relies on the existence and terms of her employment contract with RAA to bring

Count I against the Shareholder Defendants, alleging that RAA breached its agreement with her

and the Shareholder Defendants caused RAA to breach its agreement."  *Id*.  The court also held

that the plaintiff satisfied the first prong because the complaint "implicate[d] the [employment

agreement] in Count II and Count III, basing those claims on representations RAA made to her in

---

[24] "(1) [W]hen a signatory to the agreement must rely on the terms of the agreement in making a claim against a non-signatory; or (2) when a signatory alleges substantial interdependence and concerted misconduct by both another signatory and a non-signatory, making arbitration between signatories meaningless." *Mulqueen* at *6 (quoting *Horanburg* at ¶ 17).

its "offer of shareholder" and "offer of employment[,]" which culminated with the execution of the Agreement.  *Id*.

Turning to substantial interdependence and concerted misconduct estoppel, the court reasoned that the "complaint [was] replete with factually intertwined allegations that the signatory, RAA, and non-signatories, the Shareholder Defendants engaged in misconduct."  *Id*. at *7. Specifically, the complaint made allegations that the shareholder defendants "conspired to harm [[p]laintiff's] interests in RAA and her employment" and that shareholder defendants "engaged in conduct to squeeze [[p]laintiff] out of her ownership and employment position at RAA."  *Id*. Lastly, the complaint alleged that the "individual Defendants . . . prevent[ed] [plaintiff] from acquiring or continuing a prospective relation with RAA."  *Id*.  The court "conclude[d] that the facts giving rise to her claims against the Shareholder Defendants are so intertwined and interdependent with her claims against RAA that they are inherently inseparable."  *Id*. (citation omitted).  The court determined that "allow[ing] [the plaintiff] to effectively avoid the arbitration provision by naming the individual RAA shareholders as defendants undermines [New Mexico's] statewide policy favoring arbitration and renders meaningless the purpose of the arbitration clause in the [employment agreement]."  *Id*. at 7.

A brief review of two federal cases (cited in Defendant's amended motion) will complete the Court's survey of New Mexico law.  In *Goldsborough v. Newpark Drilling Fluids, LLC*, 2020 WL 619211, *1 (D.N.M. Feb. 10, 2020), an oilfield "mud" engineer signed an independent contractor agreement with Upstream, a third-party staffing company.  That agreement included the engineer's promise to arbitrate any wage claims against Upstream *or its clients*.  *Id.*  As one of Upstream's clients, Defendant Newpark moved as a non-signatory to compel Goldsborough to arbitrate his claims against it.  *Id.*  Newpark argued that it was entitled to the relief it sought both

44

as a third-party beneficiary of the agreement and by virtue of equitable estoppel.  *Id.*  Applying Texas law, the district court granted Newpark's motion on both grounds. *Id.* **2-4. With respect to equitable estoppel, however, the court had occasion only to evaluate direct benefits estoppel, which New Mexico recognizes under its equitable estoppel doctrine but which is not relevant to the instant case. *Id.* *4.

In *La Frontera Center, Inc. v. United Behavioral Health, Inc.*, 268 F. Supp. 3d 1167, 1219 (D.N.M. 2017), the plaintiff agreed to provide behavioral health services as a subcontractor for the defendants, United Behavioral Health, United Healthcare Insurance Company, and Optumhealth New Mexico (a d/b/a entity of United) (collectively "United").  United had "agreed to implement and manage New Mexico's Medicaid and State funded programs to deliver services and pay providers for supplying behavioral health and substance abuse services to Enrollees.*" Id.* at 1175–76.  La Frontera sued, "alleging nine separate state law tort, contract, statutory, and restitutionary claims against United . . . [that] ar[o]se from the circumstances surrounding the formation and performance of several provider agreements that United [] and La Frontera executed." *Id.* at 1181. Specifically, the "Participating Provider Agreement" that United Behavior Health and La Frontera executed and which contained an arbitration clause, omitted United Healthcare and Optumhealth as signatories. *Id.* at 1179.  Predictably, United Healthcare and Optumhealth moved to compel arbitration under that agreement.  La Frontera resisted, contending that "[t]here [was] no valid, enforceable agreement to arbitrate." *Id.* at 1182.  Among other things, La Frontera asserted that "the Court should not compel arbitration of all of La Frontera's claims, because not all of the claims that La Frontera asserts in its First Amended Complaint arise from the Participating Provider Agreement" and are not ""are not based on any written agreements with [United Health]." *Id.* at 1184.  According to La Frontera, "[t]he facts underpinning [its] claims do not require performance

or interpretation of the [Participating Provider Agreement], nor arise out of that agreement." *Id.* (internal quotations and citations omitted).

In its opinion, the court determined that the New Mexico Supreme Court would adopt equitable estoppel in the arbitration context. *Id.* at 1218 (discussing New Mexico case law). The court then estopped La Frontera from avoiding arbitration of its claims against United Healthcare and Optumhealth. *Id.* at 1216. In doing so, the court reasoned that (1) "Optumhealth is a joint venture that United Behavioral Health and United Healthcare Insurance operate," (2) the first amended complaint "asserted nine claims, and each claim refers to each entity associated with the joint venture—United Behavioral Health, United Healthcare Insurance, and Optumhealth—as 'United[],'" and (3) several of the claims "rely on, or arise out of, the Participating Provider Agreement that United Behavioral Health and La Frontera executed." *Id.* at 1218-19. In sum, the court concluded the arbitration agreement covered the claims against United Healthcare Insurance and Optumhealth because of "(i) La Frontera's agreement to arbitrate disputes arising from its business relationship with United Behavioral Health; and (ii) the interdependence, if not the indistinguishability, of La Frontera's claims against United Behavioral Health, and La Frontera's claims against United Healthcare Insurance and Optumhealth." *Id.* at 1219.

The foregoing survey of New Mexico cases leaves this Court with the distinct impression that the case before it is meaningfully different from any of the others. Every other case cited by Defendant, whether from New Mexico or elsewhere, in which a court invoked the "interdependent and concerted misconduct" variety of estoppel, involved the signatory that was resisting arbitration having actually *made allegations* in its complaint of such misconduct against another signatory and the non-signatory in question. Here, at the risk of belaboring the point, the Court emphasizes that Plaintiffs have made no such allegations. While their reasons for doing so may be so

46

transparent as to be obvious, the fact remains that their Complaint *does not allege* that Defendant Salt Creek engaged in any conduct or misconduct whatsoever with Kestrel.  That distinction extracts this case from the heartland of all other concerted misconduct estoppel cases of which this Court is aware.

The bottom line, therefore, is that New Mexico's concerted misconduct estoppel doctrine – in its current articulation – simply does not apply to a complaint that makes no such allegations. And Defendant has given this Court no reason to believe that the New Mexico Supreme Court – even were it to formally adopt the two-pronged doctrine of equitable estoppel that has been charted out by the New Mexico Court of Appeals – would extend the doctrine to reach a set of facts that are so demonstrably different.[25]  To do so, the state supreme court would essentially have to invent a third prong of the doctrine, one that would estop signatories from plotting to avoid arbitration by deliberately sanitizing their complaints against non-signatories to omit any reference to another signatory.  So far as the Court is aware, no court anywhere has added that prong to its equitable estoppel doctrine, and the Court is loath to speculate that New Mexico's Supreme Court might do so here.[26]

For the foregoing reasons, the Court recommends that Defendant's Amended MTC be **DENIED.**

---

[25] Trying to predict how the New Mexico Supreme Court might rule on any issue in any case is a challenging exercise. For that reason, the presiding judge might consider certifying this question to that court.  *See* N.M. R. App. P. 12-607 (2018) ("[t]he Supreme Court may answer by formal written opinion questions of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and the question is one for which answer is not provided by a controlling . . . appellate opinion of the New Mexico Supreme Court or the New Mexico Court of Appeals").

[26] A final point:  Defendant asserts at least twice in its amended motion to compel that the denial of its motion would have the effect of rendering the AA "meaningless" as it relates to Kestrel.  Def.'s Amend. MTC 2, 15.  The Court finds that worry to be exaggerated.  After all, the AA provides Kestrel (and the other entities and individuals identified in Section 1 of the AA) with enormous protection if it is sued by any of its employees:  individual arbitration versus class/collective action in court.  This case is perhaps the best proof of that protection.  That Kestrel *separately* agreed in the MSA to indemnify Defendant Salt Creek under certain circumstances does not render the AA "meaningless."

## V.    CONCLUSION

For the foregoing reasons, **IT IS RECOMMENDED** that Kestrel's "Motion to Intervene" [ECF 31], be **GRANTED.**

**IT IS FURTHER RECOMMENDED** that Kestrel's "Motion to Compel Arbitration" [ECF 44] be **DENIED IN PART** and **GRANTED IN PART**.

**IT IS FURTHER RECOMMENDED** that Defendant's "Amended Motion to Compel Arbitration and Stay Proceedings" [ECF 66] be **DENIED**.

**IT IS FURTHER RECOMMENDED** that Defendant's (original) "Motion to Compel Arbitration and Stay Proceedings" [ECF 44] be **DENIED** as moot.

**SO RECOMMENDED.**

_____
**THE HONORABLE GREGORY J. FOURATT**
**UNITED STATES MAGISTRATE JUDGE**

> **THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1)(c). Any request for an extension must be filed in writing no later than seven days from the date of this filing. **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed**.