**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

_____

THOMAS BOCK, on behalf
of himself and all others similarly situated,

      Plaintiff,

      v.                          Civ. No. 19-1163 WJ/GJF

SALT CREEK MIDSTREAM LLC,

      Defendant.

**MEMORANDUM OPINION AND ORDER**
**OVERRULING OBJECTIONS (DOCUMENTS 87, 88, 89)**
**TO MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED**
**DISPOSITION (REGARDING DOCUMENTS 31, 44 AND 66)**
**and**
**ORDER ADOPTING MAGISTRATE JUDGE'S PROPOSED FINDINGS AND**
**RECOMMENDED DISPOSITION**

THIS MATTER comes before the Court upon Objections to Proposed Findings and

Recommended Disposition entered by United States Magistrate Judge Gregory J. Fouratt (Doc.

86). On July 15, 2020, United States Magistrate Judge Gregory J. Fouratt entered Proposed

Findings and Recommended Disposition ("PFRD," Doc. 86) regarding three motions:[1]

- Defendant Kestrel Field Services' Motion to Intervene, Inc. (**Doc. 31**); recommending that the Court grant the motion;

- Defendant Kestrel Field Services' Motion to Compel Arbitration (**Doc. 44**), recommending that the motion be partially granted and partially denied; and

- Defendant Salt Creek Midstream's Amended Motion to Compel Arbitration and Stay Proceedings" (**Doc. 66**), recommending that the motion to compel arbitration be denied.

**BACKGROUND**

---

[1] The motions were referred to Judge Fouratt (Doc. 28) and heard at oral argument on May 20, 2020.

This is a case alleging a failure to pay overtime under the Fair Labor Standards Act ("FLSA") and the New Mexico Minimum Wage Act ("NMMWA"). Plaintiff Thomas Bock ("Bock") alleges that Salt Creek Midstream, LLC ("Salt Creek" or "Defendant") failed to pay Bock and others similarly situated overtime for hours worked in excess of forty in a week.

Defendant is a midstream operator in the oil and gas industry. To expand its transportation capacity, Defendant commissioned in 2018 the construction of a pipeline project in the Permian Basin, with a portion of the pipeline originating in New Mexico and extending into Texas. Kestrel Field Services ("Kestrel") is a staffing company that furnishes skilled employees to customers whose projects exceed the capability of their in-house workforce. Defendant contracted with Kestrel to provide personnel qualified to inspect pipeline-related features like welding and coating. Under the contract, formally known as a Master Service Agreement, Kestrel provided Defendant with inspection services at various job sites throughout west Texas and southeast New Mexico.

The inspectors, including Bock and Brett Rice, were hired by Kestrel as its employees.  As a condition of their employment, inspectors were each required to execute a bilateral Arbitration Agreement ("AA") and class action waiver. Kestrel directed the inspectors to specific job sites of Defendant to provide inspection services. Bock and other inspectors who desire to be members of a FLSA class action (hereinafter collectively "Plaintiffs") submitted their time sheets to Kestrel and were paid by Kestrel on a "day rate" which is common in the oil and gas industry, as opposed to a straight salary or an hourly wage. Kestrel did not pay its inspectors overtime, no matter how many hours they worked in a given week because it viewed the inspectors as exempt under federal and state wage-and-hour laws.  This pay structure to the inspectors gave rise to the instant lawsuit.

Plaintiffs are suing only Defendant Salt Creek, Kestrel's customer, and not Kestrel, which actually hired and paid them. Plaintiffs allege that Defendant – not Kestrel – is their "true"

employer and have affirmatively disclaimed the theory that Defendant and Kestrel were their "joint employers," opting instead to proceed on the single legal theory that Defendant was their actual employer and that its pay structure and policy violated both the Fair Labor Standards Act and the New Mexico Minimum Wage Act. Plaintiffs' complaint makes no mention whatsoever of their employment with Kestrel and in fact, the complaint is devoid of any reference to Kestrel *at all.* Both Defendant and Kestrel assert that Plaintiffs have done so for one purpose only: to circumvent, avoid, and frustrate the AA each one executed with Kestrel. On the other hand and as noted in the PFRD, Defendant denied ever being Plaintiffs' employer. Instead, Defendant identified Kestrel as Plaintiffs' sole employer and mentioned Kestrel at least eighteen times in its Amended Answer. As for Kestrel—it *concedes* that it employed Plaintiffs. *See* Doc. 86 at 7, n.6.

Based upon representations by Plaintiffs' counsel at oral argument, Judge Fouratt stated that he had "no doubt" that "but for the AA," Plaintiffs would have sued Defendant as well as Kestrel and made similar allegations against both. Doc. 86 at 3, n.3. After now becoming familiar with this case and the tension among the parties on the various issues, this Court must agree with that opinion. Under this factual backdrop, then, it is understandable that Kestrel would move to intervene and to compel Plaintiffs to individually arbitrate all of their claims, including those against Defendant. And likewise, as a non-signatory to the AA, Defendant has moved to compel Plaintiffs to individual arbitration on the theory of equitable estoppel.

Objections to the PFRD have been filed by Kestrel (Doc. 87); Defendant (Doc. 88) and Plaintiffs (Doc. 89), including responses to those objections.

## DISCUSSION

Under 28 U.S.C. §636(b)(1)(C), this Court is required to make a *de novo* determination of those portions of Judge Fouratt's findings or recommendations to which objections were made;

*see also* Fed.R.Civ.P. 72(b)(3) (district judge must determine de novo "any part of magistrate judge's disposition of dispositive motions that has been properly objected to"). A *de novo* review requires the "'district court to consider relevant evidence of record and not merely review the magistrate judge's recommendation'. . . ." *Al-Villar v. Donley*, 971 F.Supp.2d 1084, 1096 (D.N.M. 2013) (quoting *In re Griego*, 64 F.3d 580, 583–84 (10th Cir.1995)). In conducting a *de novo* review, a court "should make an independent determination of the issues . . . and not . . . give any special weight to the [prior] determination. . . ." *Ocelot Oil Corp. v. Sparrow Indus.*, 847 F.2d 1458, 1464 (10th Cir. 1988) (quoting *United States v. First City Nat. Bank*, 386 U.S. 361, 368 (1967)).

Because the parties do not directly challenge the Magistrate Judge's recommendation granting Kestrel's request to intervene as of right and permissive intervention under Fed.R.Civ.P.24 (a) and (b), the Court need not undertake a review of the PFRD on that issue, although a short synopsis does offer some context to the factual background of the case. Judge Fouratt found that Kestrel had a right to intervene because it identified several interests in the subject of the lawsuit and potential impairments to those interests; and because even though Defendant and Kestrel were "aligned broadly in common cause against Plaintiffs," their respective interests were "potentially divergent enough to satisfy "the 'minimal' burden of establishing a 'possibility' that [Kestrel's] interests will not be adequately represented" by Defendant. *Barnes v. Sec. Life of Denver Ins. Co.*, 945 F.3d 1112, 1125 (10th Cir. 2019). The PFRD also concluded that the Court should permit Kestrel to intervene under Rule 24(b) because Kestrel "has a claim or defense that shares with the main action a common question of law or fact" because of the "inextricable and indispensable role that Kestrel played in the factual scenario that gave rise to this lawsuit, coupled with the commonality of claims and defenses it would have with respect to the

4

parties to this lawsuit . . . ." Doc. 86 at 13. *See* Fed. R. Civ. P. 24(b)(1)(B).  *Tri-State Generation & Transmission Ass'n, Inc. v. New Mexico Pub. Regulation Comm'n*, 787 F.3d 1068, 1074 (10th Cir. 2015) (quoting Fed. R. Civ. P. 24(b)(3)).  The PFRD further recommended intervention because it found that intervention would not unduly delay or prejudice the adjudication of the original parties' rights. Any delay thus far in the case as to discovery or scheduling was found to be due to the then-pending Defendant's Motion to Compel Arbitration, and not because of any matter related to Kestrel.  *Id.*

The PFRD thoroughly sets out the applicable law on each issue discussed.  Since the parties raise no objection to any of the black-letter law cited in the PFRD, the Court finds it unnecessary to repeat the legal standards here except where relevant to the analysis.

## I.      Kestrel's Objections (Doc. 87) and Plaintiffs' Response to Objections (Doc. 92)

The Magistrate Judge denied Kestrel's motion that Plaintiffs be compelled to arbitrate their claims against Defendant, but granted the motion in part to the extent that Kestrel seeks a ruling forbidding Plaintiffs from pursuing their claims against Defendant in a class or collective action. Kestrel's objections are directed to the Magistrate Judge's recommendations on its Motion to Compel (Doc. 44) that Plaintiffs are not required to arbitrate their claims. The dispute centers around the first paragraph of the AA, which contains the following language in each AA:

> 1.      **MUTUAL ARBITRATION AGREEMENT**. The Company and I mutually agree and contract to resolve by arbitration all past, present, or future *claims or controversies*, including, but not limited to, claims arising out of or related to my application for employment, employment, or termination of my employment that the Company may have against me or I may have against: (i) the Company or its subsidiaries or affiliated entities ("Kestrel Entities"): (ii) Kestrel Entities officers, directors, employees, or agents in their capacity as such or otherwise: (iii) Kestrel Entities' benefit plans or the plans' sponsors, fiduciaries, administrators, affiliates, and agents, and/or (iii) all of their successors and assigns. All *disputes* covered by this Agreement will be decided by an arbitrator through individual arbitration, not by way of court or jury trial.

Doc. 44-1 at 6-8, §1 (emphasis added). Kestrel takes the position that the plain language of the AA extends to Plaintiffs' claims against Defendant as a *customer* and seeks to compel Plaintiffs to arbitrate their claims and to do so in individual, not collective, actions based on the waiver provision in the AA precluding Plaintiffs from engaging in any class or collective action against anyone--whether in court or in arbitration. Plaintiffs contend that the AA does not apply here since they have not sued Kestrel.[2]

Judge Fouratt recommended that the AA be interpreted so as *not* to apply to Plaintiffs' claims against Defendant because the AA—"as interpreted through the use of ordinary tools of contract interpretation–would not have put the objective reader on notice that claims, controversies, or disputes against Kestrel's *customers* fell within the scope of the AA." Doc. 86 at 20. Kestrel raises three objections, each of which will be addressed in turn.

A.    Construing the AA Against Drafter

Kestrel argues that the AA was drafted as a broad instrument and should not be construed against its drafter.

"[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp.*, 473 U.S. at 626; *see also Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1286-87 (10th Cir. 1997) (whether an agreement to arbitrate exists at all "is a threshold matter which must be established before the FAA[3] can be invoked."). In deciding whether a particular dispute falls within the scope of an arbitration agreement, the Tenth Circuit uses a three-part test which looks to classify a particular clause as either broad or narrow:

---

[2] Challenges to the recommendation made with respect to the Class Action Waiver will be discussed later in this opinion.

[3] The Federal Arbitration Act, 9 U.S.C. §§1-16 ("FAA").

> Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview. Where the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it.

*Sanchez v. Nitro-Lift Techs., L.L.C.*, 762 F.3d 1139, 1146 (10th Cir. 2014) (citation omitted). Kestrel contends that the AA is broad because it requires Plaintiffs to arbitrate all "disputes" and "controversies" and uses sweeping language like "including, but not limited to." For purposes of the analysis contained in the PFRD, the Magistrate Judge assumed that the arbitration agreement belonged to the "broad" variety, yet did not find it "so broad as to reach claims that are plainly beyond the scope of the agreement." Doc. 86 at 19, n.3 (see discussion, below).

Kestrel also contends that Judge Fouratt concluded the AA was ambiguous and so he should have construed those ambiguities in favor of arbitration and compelled Plaintiffs to arbitrate their claims—but this argument plays out against Kestrel for two reasons. First, it is a "well-accepted rule that ambiguities in contracts are construed against the drafter." *Dumais v. American Golf Corp.*, 299 F.3d 1216, 1219 (10th Cir. 2002) (citation omitted). Kestrel urges the Court to ignore that rule and decide that the AA was broad enough to create an unrebuttable presumption of arbitrability. As Plaintiffs point out in their response to Kestrel's objections, Kestrel is incorrect in asserting that this rule cannot apply to arbitration contracts. *See id.* (construing arbitration provision against drafter). Second, Judge Fouratt never actually found the arbitration provisions to be ambiguous. Rather, it was Kestrel's attempts to parse distinctions in certain terms used in Section 1 (discussed further below) which created any confusion. *See, e.g.*:

> Doc. 86 at 22: "Furthermore, the Court worries that Kestrel has stretched Black's definition of "controversy" and "dispute" past their literal meaning."

> Doc. 86 at 25: "After all of this whip-sawing, although the reader might not suffer from blurred vision and vertigo, he or she certainly should be forgiven for not

7

appreciating the subtle differences between "claim," "controversy," and "dispute" *that Kestrel insists are plain and obvious*." (emphasis added).

In fact, the Magistrate Judge concluded that, "*[b]y its plain language*, [§1] limits the claims, controversies, and disputes subject to arbitration to be those by and between the signing employee and the list of entities and individuals identified therein. Doc. 86 at 26 (emphasis added). Third, Kestrel maintains that ambiguities regarding the scope of a broad arbitration clause are resolved in favor of arbitration, relying in part on a United States Supreme Court case, *Lamps Plus, Inc. v. Varela,* 139 S.Ct. 1407, 1418 (2019). However, this reliance is misplaced because—as Plaintiffs note in their response—the issue here is not the *scope* of an arbitration agreement, but the threshold question of *who* agreed to arbitrate in the first place. *See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 664 (2010) (parties may specify "with whom they choose  to arbitrate their disputes"); *Dish Network L.L.C. v. Ray*, 900 F.3d 1240, 1243 (10th Cir. 2018) (". . . arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit") (citing *Howsam v. Dean Witter Reynolds, Inc.* 537 U.S. at 83 (2002); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 626 (1985) (the "first task of a court asked to compel arbitration of a dispute is to determine whether *the parties agreed* to arbitrate that dispute") (emphasis added).

For these reasons, the Court OVERRULES Kestrel's objections on this issue.

B.    Definition of Terms

Kestrel objects to the PFRD's conclusions regarding the definitions of "claim," "controversy," and "dispute."

Kestrel concedes that the AA's first paragraph limited the agreement to *"claims"* against certain parties, but contends that "controversies" and "disputes" could be interpreted more broadly, in that rather than being limited simply to claims against particular parties, the terms could refer

to anything that may give rise to a particular lawsuit.  Kestrel argues that the AA could encompass suits against Kestrel's *customers* such as Defendant, despite the fact that Kestrel was not a signatory to the AA.  Moreover, Kestrel came up with its own two-prong test for whether a dispute comes within the scope of the AA: (1) if the dispute "involves" Plaintiffs and Kestrel; and (2) if the dispute arises out of Plaintiffs' employment relationship with Kestrel. Doc. 44 at 10.

After a detailed analysis of the matter, Judge Fouratt recommended that the AA be held not to apply to Plaintiffs' claims against Defendant based on: (a) the complete silence on the topic of Kestrel's customers; (b) the definitions of the terms "claims," "controversies" and "disputes"; and (c) the language used in the agreement overall.[4]

Judge Fouratt considered the definitions of "claims," "controversies" and "disputes" found in Black's Law Dictionary (11th ed. 2019) and observed:

> If a reference as revered as Black's Law Dictionary uses "claim," "controversy," and "dispute" as synonyms at various times in various contexts, it is difficult for the Court to accept Kestrel's argument that an ordinary reasonable person should somehow be able to maintain rigid distinctions between those terms when reading the AA.

Doc. 86 at 22.[5]  Based on a reading of those terms within the language of the AA overall, the Magistrate Judge concluded that "claim," "controversy" and "dispute" (and their plurals) "are used synonymously and interchangeably in the AA "without any apparent rationale, even though

---

[4] The Court takes up the issue of the AA's silence regarding Kestrel's customers in the next section.

[5] Black's defined the terms as follows:

CLAIM: A demand for money, property, or a legal remedy to which one asserts a right; esp., the part of a complaint in a civil action specifying what relief the plaintiff asks for;

CONTROVERSY: 1. A disagreement or a dispute, esp. in public. 2. A justiciable dispute; and

DISPUTE: A conflict or controversy, esp. one that has given rise to a particular lawsuit.

they were not necessarily "close synonyms" and were not separately defined. Doc. 86 at 25.[6]  This Court, bringing fresh eyes to the issues here, agrees with the Magistrate Judge's analysis and conclusions on this issue.  First, the Court agrees that the three terms at issue here are in fact used interchangeably through the AA based on their common meanings.  Kestrel reads meanings and definitions into the terms "claim," controversy" and "dispute" that simply aren't there. As Plaintiffs describe it, Kestrel "cherry-picks" these terms from different sections throughout the AA and stretches them beyond their literal meaning to fit the desired outcome.  This practice is not an acceptable method of contract interpretation. *Montoya v. Villa Linda Mall, Ltd.*, 110 N.M. 128, 130, 793 (1990) (the law favors a reasonable construction of contract language).[7] *Bank of New Mexico v. Sholer*, 102 N.M. 78, 79, 691 P.2d 465, 466 (N.M. 1984) ("A contract must be construed as a harmonious whole, and every word or phrase must be given meaning and significance according to its importance in the context of the whole contract.").

Second, the overall language in the AA also supports the finding that the terms "claims," "controversies" and "disputes" are used interchangeably. Attributing distinct meanings to each of the terms would be an ever-shifting, and impossible—task. For example, Section 2 is entitled "HOW TO INITIATE ARBITRATION OF COVERED *DISPUTES*," but its first sentence instructs the parties to the AA how and when to arbitrate a "claim." Doc. 44-1 at 6 (emphasis added). As noted by the Magistrate Judge, this would suggest that the AA uses "dispute" and "claim" as synonyms. But in its last sentence, §2 seems to revert to a somewhat different definition of "dispute" by advising that "[t]he arbitrator shall resolve all "disputes" regarding whether a

---

[6] The Magistrate Judge commented that such imprecise drafting as to the precise meaning of terms was "among the leading reasons why ambiguities in contracts are construed against their drafter." Doc. 86 at 25.

[7] As noted in the PFRD, Kestrel and Plaintiffs agree that the AA would be analyzed the same under New Mexico or Texas law. *See* Doc. 86 at 15.

request for arbitration was proper and on time." *Id*. As used there, "dispute" refers to a legal issue collateral to a "claim." The other sections fare no better as far as illustrating distinct meanings for each of these terms.  The only construction that makes sense is that the terms are used interchangeably.

The Court also finds that any distinctions among the terms are inconsequential and, as mentioned previously, any potential confusion over the use of the terms at issue is compounded by Kestrel's attempts to broaden the meaning of these terms beyond their generally accepted meanings. Also, notwithstanding the flexibility or interchangeability of these terms in the AA, there is nothing in the language of the AA suggesting these terms mean that claims, controversies or disputes may be brought against *Defendant*.  The only entities (signatories or otherwise) included or referenced in §1 are Kestrel, more particularly described "Kestrel Entities" and its agents and affiliates, and Plaintiffs.  Doc. 44-1 at 6, §1, (i), (ii), & (iii).  There is no mention of Salt Creek (or any other person or entity) in the AA, either express or implied.

Kestrel's position cannot be sustained without overreaching.  As Judge Fouratt noted, Kestrel's two-prong test "elasticizes" Black's definitions of "dispute" and "controversy" by referring to them in the broader context in which any lawsuit arises, and inserts the amorphous term "involves" which appears nowhere in the definitions.  The Court agrees with Plaintiffs that Kestrel's adaptation of the definitions of these terms "would not be readily obvious to the objective reader of the AA," Doc. 86 at 23, and declines Kestrel's invitation to accept a much broader meaning for the terms than is warranted based on the language in the AA. *See Sun Vineyards, Inc. v. Luna County Wine Dev. Corp.,* 107 N.M. 524 (1988) (the usual and customary meaning is given to language used in a contract); *Bank of N.M. v. Sholer,* 102 N.M. at 79 ("Tortured readings of terms and phrases have no place in contract interpretation. . . .").

Kestrel's objections to the Magistrate Judge's findings and recommendations regarding the definitions of "claim," "controversy," and "dispute" are therefore OVERRULED

C.      Interpretation of AA to Include Kestrel's "Customers"

Kestrel next objects to the PFRD's conclusion that the AA would not have put the objective reader on notice that the claims, controversies, or disputes with Kestrel's customers (such as Salt Creek) fell within the scope of the AA.  The Magistrate Judge concluded that in drafting the AA, Kestrel chose not to include its customers within its scope, for  whatever reason it had, and that this omission was not an oversight. Turning to the language of the AA, the PFRD focused on the "obvious," that is, that the AA "is *completely silent* on the topic of Kestrel's customers" but that it was "not silent on its application to other entities and individuals." Doc. 86 at 20.

Kestrel points out that the goal of contract interpretation is to determine the parties' intent. *ConocoPhillips Co. v. Lyons*, 2013-NMSC-009, ¶ 23, 299 P.3d 844, 852, and insists that the language "including, but not limited to," covers any other parties related to Plaintiffs' employment, such as its customers.  Kestrel insists that because Plaintiffs knew their Kestrel employment was for the sole purpose of providing services to Kestrel's customers, Plaintiffs would have been on notice that controversies, or disputes with Kestrel's customers fellwithin the scope of the AA, and that the provision's language is general enough to encompass Kestrel customers. Kestrel also disagrees with the Magistrate Judge's reasoning that the specific listing of Kestrel entities in §1 signifies an intent to exclude other non-Kestrel parties—also known as the doctrine of *expressio unius est exclusio alterius. See Elwell v. Oklahoma ex rel. Bd. of Regents of Univ. of Oklahoma*, 693 F.3d 1303, 1312 (10th Cir. 2012) (the specification of one provision implies the exclusion of others) (citing *Arizona v. United States,* —— U.S. ——, 132 S.Ct. 2492, 2520 (2012) (Scalia, J., concurring in part and dissenting in part).

Here again, the Court's analysis coincides with that of the Magistrate Judge. The very first sentence of §1 states that "[t]he Company and I mutually agree and contract to resolve by arbitration . . ."  and further defines "Kestrel Field Services, Inc., formerly Kestrel Engineering, Inc." as the "Company." Doc. 44-1 at 6. The language that follows—at least half of §1—is language listing the parties entering into the arbitration agreement *and with whom* they must arbitrate. This list is limited solely to Kestrel entities, affiliates and agents and there is no mention of any other entity or party.  Kestrel is hard-pressed to successfully argue that the non-inclusion of customers was an inadvertence when it appears that the drafters went out of their way *not* to include reference to Kestrel customers. And yet, Kestrel asked the Magistrate Judge, and now this Court, to replace those carefully selected words and phrases with the solitary word "Anyone." There simply is no tool of contract interpretation which allows Kestrel to take such a liberty. *See Alvarez v. Sw. Life Ins. Co., Inc.*, 86 N.M. 300, 303, 523 P.2d 544, 547 (1974) (A court "cannot rewrite the contract of the parties to mean something it does not say").

As the Magistrate Judge noted, Kestrel generates revenue *only* by hiring out its own employees to fill workforce gaps for its customers. Doc. 86 at 21. Yet, despite what had to be an essential awareness of potential disputes between its employees and its customers, Kestrel (the sole drafter of the agreement) elected for whatever reason not to explicitly include its customers in the agreement. *See, Shoals v. Owens & Minor Distribution, Inc*., 2018 WL 5761764, *10 (E.D. Cal. Oct. 31, 2018) (because a staffing company "almost exclusively sends its employees to work for its customers, it certainly could have foreseen that its employees may have claims against its customers and worded its standard arbitration agreement accordingly").  At oral argument, counsel for Kestrel offered a "guess" as to why Kestrel's customers were not included in the provision—either because the omission was an oversight or because the law firm that drafted the agreement

13

believed that the language in §1 covered situations arising out of employment.  Doc. 86 at 21, n.15. While neither "guess" can be considered evidence of intent for purposes of contract interpretation here, both potential explanations can be summarily rejected.  With respect to the former, an "oversight" cannot be held against the non-drafter; and as to the latter, it would have been quite simple for Kestrel to include language making it clear that the provision covered *any* claim arising out of employment against parties other than Kestrel.  Instead, the language in §1 expressly limits the parties involved to Kestrel entities, affiliates and agents.  Thus, despite Kestrel's objection to the application of the doctrine *expressio unius est exclusion alterius*, the doctrine nevertheless applies based on the exclusion of language listing any customers, clients, vendors, suppliers, or potential joint employers while listing only Kestrel entities, agencies and agents.

In closing on this issue, the Court cannot resist borrowing the following language from the PFRD, which sums up the analysis graphically, but accurately:

> By its plain language, that section limits the claims, controversies, and disputes subject to arbitration to be those by and between the signing employee and the list of entities and individuals identified therein. *To say now that the language is malleable enough to apply to lawsuits against its customers – whom Kestrel kept off the list and out of that section – would permit Kestrel to smuggle an elephant through a keyhole, a result the Court believes is not warranted by governing law.* In the final analysis, Kestrel's [motion to compel arbitration] invites the Court to rewrite the AA and thereby cure what might have been a drafting error, an oversight, a failure to predict the future, some combination of these, or something else altogether. The Court declines the invitation and urges the presiding judge to do the same.

Doc. 86 at 25 (emphasis added). This presiding judge also declines Kestrel's invitation to "smuggle an elephant through a keyhole" and overrules Kestrel's objections on this issue.

## II.     Objections Filed by Plaintiff Bock (Doc. 89)

### A.     <u>Class Action Waiver</u>

The Magistrate Judge recommended that Kestrel be permitted to sever out and enforce the class action waiver provision in the AA.  Section 3 of the AA provides:

Section 3 of the AA provides:

CLASS ACTION WAIVER. The Company and I waive any right for any dispute to be brought, heard, decided, or arbitrated as a class and/or collective action ("Class Action Waiver"). An arbitrator shall have no authority under this Agreement to hear or arbitrate any class or collective action dispute. Notwithstanding any other provision in this Agreement, this Class Action Waiver shall not be severable from this Agreement in any instance in which a dispute is brought as a class and/or collective action. Notwithstanding any other language in this Agreement, any rules or procedures that may apply by virtue of this Agreement, any arbitration organization rules or procedures that apply, or any amendments and/or modifications to those rules, any claim or assertion that the Class Action Waiver or any part of it is unenforceable, inapplicable, unconscionable, void, or voidable shall be determined only by a court of competent jurisdiction, not an arbitrator.

Doc. 44-1 at 6, §3.  Kestrel contends that the above language makes it plain that Plaintiffs agreed not to bring any dispute as a collective action, whether in court or in arbitration and that this Class Action Waiver is an independently enforceable provision.  Plaintiffs contend that the waiver is an integral part of the agreement and is not severable because it refers solely to the restrictions on what can be pursued *in arbitration*.

The Magistrate Judge recommended that the undersigned judge enter a ruling forbidding Plaintiffs from pursuing their claims against Defendant in a class or collective action for two reasons.  First, Judge Fouratt noted specifically that Plaintiffs waived their opposition to the enforcement of the class action waiver because they failed to respond to Kestrel's argument on that issue in their response.  At oral argument, counsel for Plaintiffs explained that they had inadvertently filed an earlier draft of the response which had omitted this argument.  Judge Fouratt granted Plaintiffs leave to file an amended response the day after oral argument, *see* Doc. 75, but the amended pleading still did not offer a response on the issue. Doc. 86 at 27-28 (noting that the amended response "offers not a single syllable on the topic.").  Judge Fouratt viewed this failure as Plaintiffs' forfeiture of the right to further respond, particularly in light of the fact that *just the*

*day before,* the Court and counsel had discussed Plaintiffs' failure to respond to that argument. *See* Doc. 86 at 28; D.N.M.LR-Civ.7.1(b) ("[t]he failure of a party to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion").

Second, Judge Fouratt also recommended that Plaintiff's argument, even based on the "short and summary response" presented at oral argument, would fail on the merits. He found that the language of the class action waiver—unlike §1 of the AA, "does not contain any limitation whatsoever on the disputes or the parties to the disputes that fall within its scope." Doc. 86 at 28. Judge Fouratt therefore concluded that the provision should be viewed as part and parcel of the AA rather than a stand-alone provision because the class action waiver "plainly applies to '*any* dispute' that can "be brought, heard, decided, *or arbitrated*[.]" Doc. 86 at 28. In coming to this conclusion, Judge Fouratt looked to *Snow v. Silver Creek Midstream Holdings, LLC*, which was a case with analogous facts, parties in the same posture, an "arbitration agreement," and even overlapping counsel. No. 2:19-cv-00241-SBJ (D. Wyo. Apr. 4, 2020). The Magistrate Judge found that, just as the language in one provision in *Snow* was broader than another and omitted certain restrictive language, the language in the class action waiver was broader than the arbitration clause in §1. Plaintiffs have nothing to say regarding *Snow's* applicability to this issue, which the court finds curious, particularly because Plaintiffs also completely ignored *Snow* when Kestrel first submitted that case as supplemental authority (Doc. 55-1).

Plaintiffs object both to the conclusion that they have waived their opposition argument as well as to Judge Fouratt's recommendation on the merits. With respect to the former, Plaintiffs claim that they "were not authorized to edit the response" that they intended to file before oral argument and with respect to the latter, blame their sparse opposition argument on the fact that

Kestrel had not expended much time on the issue either.  The Court is not at all clear on the meaning of the first excuse (*who* did not "authorize" Plaintiffs to edit a deficient brief?); and as to Plaintiffs' hindsight observation regarding the amount of time spent on their response—the Court can offer little by way of empathy except to say it was Plaintiff's call to shortchange the argument.

The Court is not inclined to give Plaintiffs a third opportunity to present an argument on the class action waiver when their excuses for failing to do so do not have merit, and the Court agrees with the Magistrate Judge that Plaintiffs have forfeited their opportunity to oppose the waiver on the merits. *See, e.g., Cole v. New Mexico*, 58 F. App'x 825, 829 (10th Cir. 2003) (unpublished) (argument waived when not raised in initial response to motion to dismiss); *Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768 (10th Cir. 2001) (unpublished) (plaintiff abandoned claim when failed to respond to arguments made in support of summary judgment).  In their objections, Plaintiffs have now optimistically offered the argument they should have offered long ago, but Plaintiffs offer nothing on the merits to persuade the court that the class action waiver is not a severable provision.

Plaintiffs contend that the waiver mandates that the provision be treated as part of the AA and not as a separate agreement, relying specifically on the language: "Notwithstanding any other provision in this Agreement, this Class Action Waiver shall not be severable from this Agreement. . . ." Doc. 44-1 at 6, §3.  This might be a reasonable interpretation were it not for the rest of the wording in the sentence: ". . . in *any instance* in which a dispute is brought as a class and/or collective action." *Id.* (emphasis added).  The very language omitted by Plaintiffs directly contradicts the position they espouse and instead requires that the prohibition on class/collective actions applies ("shall not be severable") in *any instance* in which a dispute is brought as a class action.

Plaintiffs cite to *Rivera v. Am. Gen. Fin. Servs., Inc.*, as support for its position that this provision of the AA is unenforceable and unconscionable and contends that the class action waiver must be done away with as well.  259 P.3d 803, 813 (N.M. 2011).  The court in *Rivera* held a loan contract that contained an arbitration provision was held to be unfairly one-sided and unconscionable. *Id.* at 819. The Court agrees with Kestrel that *Rivera* has no relevance to the case at bar because in *Rivera,* the sole arbitral body chosen by the parties to conduct the arbitration no longer could arbitrate consumer disputes. Also, even assuming the class action waiver here was unconscionable, the class action waiver would remain and be enforceable, according to the language in the AA:

> Except as provided in section 3, 'Class Action Waiver' above, if any provision of this Agreement is adjudged to be void, voidable, or otherwise unenforceable, in whole or in part, such provision shall, without affecting the validity of the remainder of the Agreement, be severed from this Agreement. All remaining provisions shall remain in full force and effect.

Doc. 44-1 at 2, ¶9.  Therefore, any of Plaintiffs' attempts to shoot down the enforceability of the arbitration provision would have no effect on the applicability of the class action wavier.

By its plain language, the class action waiver provision is not tied to the arbitration provisions of the AA and so is not integral to that agreement.  As with *Snow*, one can easily and readily determine that the waiver covers *all* claims, whether brought against Kestrel, the other enumerated targets of § 1, or Defendant.  As Kestrel puts it, the waiver covers "what" falls under the class/collective action waiver rather than "who" (which is distinctly different from the §1 provision which lists "who" would be governed under the arbitration provision).  Doc. 90 at 4; *see* Doc. 44-1 at 6, §3 ("The Company and I waive any right for *any* dispute to be brought, heard, decided, or arbitrated as a class and/or collective action") (emphasis added). In addition, §3's waiver applies whether the claims are restricted to arbitration by §1 or brought in a court of

18

competent jurisdiction against unenumerated third parties. Plaintiffs argue that "dispute" in §3 means the same thing as "claims" and "controversy" in the AA, but this argument fails because the class action waiver is not expressed in terms of particular types of disputes, claims, or controversies between particular parties like Section 1 of the AA—it applies to anyone.

Therefore, the Court concludes that the class action waiver, unlike §1 in the AA, does not contain any limitation whatsoever on the disputes or the parties to the disputes that fall within its scope and is independently applicable, regardless of whether it is in connection with an arbitration provision or another kind of employment agreement. Plaintiffs' objections to the PFRD regarding the class action waiver are therefore overruled. As a result, Plaintiffs are precluded from pursing their claims against Defendant in a class or collective action.

B.      Plaintiffs' Theory of Employer Liability

As mentioned earlier in this opinion, the PFRD noted that Plaintiffs have opted to sue Defendant rather than Kestrel, which placed employees in pipeline inspection jobs, executed AAs with employees, and paid the employees according to the time sheets submitted to Kestrel by employees. Plaintiffs have disclaimed the theory that Defendant and Kestrel were their "joint employers" and are suing only Salt Creek on the single legal theory that Salt Creek was their actual employer and that its pay structure and policy violated both federal and state law regarding overtime pay. Doc. 86 at 36.[8]

Yet now in their objections, Plaintiffs object to being tied down to choices of their own making and claim that they do not have to "disprove" an employment relationship with anyone

---

[8] Plaintiffs are adamant regarding their silence on Kestrel's involvement in the case. In their response to Salt Creek's objections to the PFRD, Plaintiffs state that they: " . . . did not sue Kestrel, did not allege Kestrel is or was a joint employer with Salt Creek, did not make any allegations of misconduct by Kestrel and, indeed, did not make any allegations involving Kestrel at all . . . Here, Plaintiffs allege no claims and make no allegations against Kestrel." Doc. 93 at 1-2.

else.  This objection falls flat. The Magistrate Judge correctly observed that Kestrel—based on the facts in this case—appears to be Plaintiffs' true employer and that it made no sense *not* to sue Kestrel except for the single reason of avoiding the arbitration requirement in the AAs Plaintiffs signed with Kestrel. Doc. 86 at 37, n.22. The Magistrate Judge did not recommend that Plaintiffs should be required to "disprove" any employment relationship, but observed only that their position limited how they would be able to proceed in this litigation:

> To prove their claims against Defendant, Plaintiffs have to show *inter alia* that Defendant was their "employer" (a finding that requires the factfinder to apply the "economic realities" test), that their positions were not "exempt" from overtime under the appropriate statute(s), that they weren't paid a "salary," that they worked what the law defines as overtime and weren't paid what the law prescribes for overtime work.

Doc. 86 at 37-38.  Plaintiffs have limited themselves to the claim that Salt Creek is their employer and that Salt Creek violated the FLSA and the New Mexico Minimum Wage Act.  Judge Fouratt merely observed that Plaintiffs' selection of Salt Creek as the their sole "employer" defendant may hamper their ability to prevail on their burden of proof.  *Id.* at 36, n.22 ("Plaintiffs have made a high-stakes bet that they can convince the factfinder to conclude that Salt Creek, and not Kestrel, was their *sole* employer.").  As Defendant points out, Plaintiffs have enjoyed a benefit arising from their disclaiming joint employment (that is, avoiding arbitration with Kestrel) and as a result have now limited themselves to claiming that either Salt Creek or Kestrel was their employer, but not both.  They cannot backpedal from the choice they have made and attempt to involve Kestrel without first having to go through the arbitration hoops.  Plaintiffs' objections on this issue are therefore overruled.

### III.    Objections Filed by Defendant (Doc. 88)

In the underlying briefs, Defendant argued that it should be able to enforce the AA on the basis of equitable estoppel.  After a detailed and lengthy analysis of the issue, the Magistrate Judge denied Defendant's Amended Motion to Compel Arbitration.  The Court will focus on Defendant's specific objections and sees no reason to reiterate those parts of Judge Fouratt's analysis that do not bear on the substance of the objections except where helpful for context.

The PFRD recognized that equitable estoppel provides for two circumstances that allow enforcement by a non-signatory and confirmed that Plaintiffs were relying only on the second one, where the doctrine of equitable estoppel allows enforcement by a non-signatory when a signatory alleges substantial interdependence and concerted misconduct by both another signatory and a non-signatory, making arbitration between signatories meaningless.  *Horanburg v. Felter*, 2004-NMCA-121, ¶ 16, 136 N.M. 435, 99 P.3d 685).  The Magistrate Judge rejected Salt Creek's position that Plaintiffs conceded a joint employer relationship was at issue in the case and that as a result Plaintiffs must prove that Kestrel also violated the same statutes.  Rather, Plaintiffs must satisfy their burden of proof on the claims *as to Salt Creek*. Moreover, Judge Fouratt concluded that while the New Mexico Supreme Court has not yet addressed the doctrine of equitable estoppel in the arbitration context, it would not extend the doctrine to reach this case. Doc. 86 at 38.

Defendant raises several objections to these recommendations, which the Court addressed in turn.

A.    Application of Equitable Estoppel Doctrine

Defendant first claims that the Magistrate Judge erred in concluding that New Mexico Equitable Estoppel principle would not require arbitration in this case.  Defendant contends that

Plaintiffs' allegations of misconduct in the Complaint are allegations of interdependent and concerted misconduct between Salt Creek and Kestrel, despite the complaint's strategic silence as to Kestrel and therefore would fall within one of the exceptions allowing reliance on the doctrine. Defendant also claims that the doctrine should apply because it is intended to protect against "artful pleading just like that at issue here."  Doc. 88 at 7.

In stark contrast to Defendant's argument, the PFRD offers an exhaustive survey of New Mexico case law with references to several cases from the New Mexico Court of Appeals addressing the application of the doctrine in the arbitration context.  Again, the Court finds no need to parrot Judge Fouratt's comprehensive presentation of those cases.  Suffice it to say that courts in these cases applied equitable estoppel to enforce an arbitration clause against a nonparty or non-signatory where either of the circumstances allowing enforcement of an arbitration provision by a non-signatory applied. *See, e.g., Damon v. StrucSure Home Warranty*, LLC, 2014-NMCA-116, ¶1, 338 P.3d 123 (concluding that non-signatory to home warranty contract with arbitration provision could not avoid arbitration provision where it "voluntarily sought to embrace and invoke the benefits created by the warranty"); *Mulqueen v. Radiology Assocs. Of Albuquerque, P.A.,* No. A-1-CA-35852, 2019 WL 1231408, at 5 (N.M. Ct. App. Feb 4, 2019) (unpublished) (enforcing arbitration provision in plaintiff's employment agreement against non-signatory defendant shareholders where the complaint was "replete with factually intertwined allegations" that the signatory employer as well as non-signatory defendant shareholders had conspired to harm plaintiff's interests); *La Frontera Center, Inc. v. United Behavioral Health, Inc.,* 268 F.Supp.3d 1167, 1219 (D.N.M. 2017) (compelling arbitration against non-signatories where they were doing business as a joint venture with signatories and where allegations asserted claims which referred to each entity associated with the joint venture).

On the other hand, courts did not enforce arbitration based on equitable estoppel where neither exception was present.  *See, e.g., Horanburg,* 136 N.M. at 435 (application of equitable estoppel inappropriate where plaintiff's claims against non-signatory co-worker were not alleged to be derived from the agreement between plaintiff and employer and where arbitration agreement would not be rendered meaningless even if co-worker was not involved in arbitration); *Murken v. Suncor Energy, Inc.,* 205-NMCA-102, 138 N.M. 179, 117 P.3d 985 (defendant signatory could not compel a non-signatory into arbitration where plaintiff's allegations were not "relevant to third-party action between signatory and non-signatory");[9] *Frederick v. Sun 1031, LLC,* 2012-NMCA-118, ¶25, 293 P.3d 934, 941 (reversing district court's application of equitable estoppel to enforce arbitration against defendant broker where plaintiff had entered into purchase agreements containing arbitration provision with shell companies overseen by broker and where shell companies moved to compel arbitration against broker, finding that allegations in broker-dealer's third-party complaint were not relevant to claims between plaintiff and broker).

The Court's conclusion on this issue mirrors that reached by the Magistrate Judge in that the undersigned judge would agree that the  New Mexico Supreme Court would not apply the doctrine in this case.  For some reason, Defendant refuses to acknowledge the factual distinctions in this case that would preclude application of the doctrine, always insisting instead that the complaint contains allegations of interdependent and concerted misconduct between Defendant and Kestrel.  It does not.

This case has none of the indicia that would suggest that equitable estoppel can be used to enforce the AA against Plaintiffs. There are no facts alleging joint venture/subsidiary relationships as there were in *La Frontera*.  Even more importantly, the complaint is deliberately silent on any

---

[9] As noted by the Magistrate Judge, the scenario in *Murken* was the "inverse" of that in the case at bar where a non-signatory (Salt Creek) seeks to compel a signatory (Plaintiffs) into arbitration.  Doc. 86 at 40.

mention of Kestrel or alleged conduct on the part of Kestrel—unlike *any* of mentioned cases that applied equitable estoppel.  Once again, the Court finds it convenient to refer to the well-phrased language in the PFRD:

> The foregoing survey of New Mexico cases leaves this Court with the distinct impression that the case before it is meaningfully different from any of the others. Every other case cited by Defendant, whether from New Mexico or elsewhere, in which a court invoked the "interdependent and concerted misconduct" variety of estoppel, involved the signatory that was resisting arbitration having actually *made allegations* in its complaint of such misconduct against another signatory and the non-signatory in question. Here, at the risk of belaboring the point, the Court emphasizes that Plaintiffs have made no such allegations. While their reasons for doing so may be so transparent as to be obvious, the fact remains that their Complaint *does not allege* that Defendant Salt Creek engaged in any conduct or misconduct whatsoever with Kestrel. That distinction extracts this case from the heartland of all other concerted misconduct estoppel cases of which this Court is aware. . . The bottom line, therefore, is that New Mexico's concerted misconduct estoppel doctrine—in its current articulation—simply does not apply to a complaint that makes no such allegations.

Doc. 86 at 46 (emphasis in original).  In other words, Salt Creek cannot hope to bring this case within the purview of equitable estoppel when Plaintiffs have deliberately omitted Kestrel as a party to this lawsuit and have taken great pains to avoid any allegations touching on the mention of Kestrel or its conduct in the complaint.[10]

For these reasons, Defendant's objections on this issue are overruled.

B.      Magistrate Judge Erroneously Limited Analysis to Allegations in Complaint

Defendant next contends that the Magistrate Judge erroneously focused its analysis on the allegations made within the four corners of the complaint instead of considering other undisputed evidence in the record.  *See Portillo v. Specialty Retailers, Inc.*, No. 08-CV-1072 WPL/KBM, 2009 WL 10699116, at *1 (D.N.M. Mar. 4, 2009) (holding that a

---

[10]   Judge Fouratt's colorful comment said it all: Plaintiffs' "laser-focus on Defendant to the exclusion of any other actor takes this case to a place that no other case in New Mexico has gone before." Doc. 86 at 46.

standard analogous to the summary judgment standard should govern motions seeking to enforce arbitration agreements and considering, in addition to the pleadings, the undisputed evidence submitted by the parties).   Defendant argues that when a complaint has been drafted in a manner intended to evade arbitration—such as what is occurring here—courts are encouraged to look beyond the form in which plaintiffs package their allegations and instead focus on the substance of those allegations. *See Chelsea Family Pharmacy, PLLC v. Medco Health Solutions, Inc.*, 567 F.3d 1191, 1198 (10th Cir. 2009); *Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524, 530-31 (5th Cir. 2000) (finding equitable estoppel principles applied under Texas law where, upon comparing plaintiff's claims as pleaded against non-signatory defendant with claims as asserted against signatory in another lawsuit, plaintiff had made a "quite obvious, if not blatant, attempt to bypass" arbitration and that, "*[i]n essence, [the signatory non-party] is a defendant*") (emphasis in original). Plaintiffs' respond that the PFRD correctly found that the factual allegations control the "substance" of their claims.

Yet again, Defendant staunchly ignores the obvious distinction between the cases it relies on and the case before the Court here:  Plaintiffs allege no claims and make no allegations against Kestrel.  *Chelsea* is not relevant because, unlike here, the litigants in that case were  both parties *and* signatories to an arbitration agreement between them, and the court in that case did not address the issue of whether a non-signatory could enforce an arbitration agreement.  567 F.3d at 1193-94.

In defense of its strategy to exclude Kestrel as completely as possible from this lawsuit, Plaintiffs point out that nothing in the FLSA requires a plaintiff to sue all his potential "employers" and that more than one entity can be a plaintiff's employer.  *See Falk*

*v. Brennan*, 414 U.S. 190, 195 (1973); *Rios v. Midwest Partitions, Inc.*, No. 15-CV-01456-PAB-MEH, 2016 WL 7212480, at *1 (D. Colo. Dec. 13, 2016)  (subcontractor defendants who were found to be joint employers defaulted for failure to answer complaint or participate in discovery).  Plaintiffs also point out that an employer can be liable as a joint employer for both its own FLSA violations *and* the FLSA violations of the employee's other joint employer.  *See* Doc. 98 (citing *Rios*, 2016 WL 7212480, *4 and *Zachary v. Rescare Ok., Inc.,* 471 F.Supp.2d 1175, 1178 (N.D.Okla. 2006).  These representations here appear to be legally correct, but in the context of this case, they also seem a bit off the mark because Plaintiffs have clearly and affirmatively disclaimed a joint employer theory. They have instead opted "to proceed on the single legal theory that Defendant was their actual employer and that its pay structure and policy violated both the Fair Labor Standards Act and the New Mexico Minimum Wage Act." Doc. 86 at 3.[11]  Thus, having drawn their line in the sand, Plaintiffs will have to adhere to the position they have taken with all of its risks: they will have to convince a jury that Salt Creek—and not Kestrel—was their *sole* employer; and that Salt Creek—and not Kestrel—violated federal and state overtime pay statutes.

Therefore, the Court overrules Defendant's objections on this issue.  At the same time, the Court cautions Plaintiffs that while they have weathered the storm surrounding the arbitration provision in the AA, their litigation course may not be smooth sailing if their intentions are to drag Kestrel into a "joint employer" situation after having already received the benefit of avoiding arbitration.

C.     Impact of Kestrel's Intervention

---

[11]   At oral argument on the parties' motions, Plaintiffs' counsel expressly denied that their theory was one of joint employer liability. Doc. 86 at 3, n.2 (citing Tr. of Oral Argument, Doc. 77 at 52).

Last, Defendant contends that the Magistrate Judge erred by failing to consider the impact of Kestrel's intervention on its Motion to Compel Arbitration and that because Kestrel has been allowed to intervene, it has become a defendant in the case despite Plaintiffs' selective pleading omitting Kestrel as a party. Defendant therefore contends that the allegations in Plaintiff's complaint have morphed into express allegations of "interdependent and concerted misconduct" between Salt Creek and Kestrel for purposes of applying New Mexico's equitable estoppel doctrine. Doc. 88 at 5.

The Court does not agree that Kestrel's posture in this case is as clear as Defendant would argue. For clarification regarding the legal effect of Kestrel's intervention, the Court again turns to representations made by Plaintiffs' counsel at the hearing before the Magistrate Judge, where counsel disputed that Kestrel's intervention automatically avails Defendant of New Mexico's concerted misconduct estoppel doctrine. The exchange went as follows:

> **Court**: Assume it [Kestrel's intervention] goes against you the way that at least until I'm told otherwise, I would then construe the playing field is that the allegations that you're making against Salt Creek are made identically against Kestrel. So now you're making the same allegations against both companies. And my question for you is if that happens, isn't the second – the concerted misconduct doctrine under New Mexico law, which I agree doesn't exist under Texas law, but under New Mexico law, is that not now available to Salt Creek?

Doc. 77 at 70: 22; 71: 4. Plaintiffs' counsel responded:

> **Plaintiff's counsel**: I think there would be distinction between claims that are in fact made by the Plaintiff and claims that are considered by the law to have been made as a result of an intervention…. In one is what has the Plaintiff alleged, right? And then, the other – because the other is determined based on what the Defendants allege. Because you can obtain a right to intervene without establishing as a matter of law, for example, that you are – that you have the interest that you claim to have. Whereas if we have judicially admitted something by making an allegation in a complaint, for example, you know, a judicial admission and a complaint, those two things are not the same to me. And so, no, I don't think that the second prong would

27

> necessarily be implicated, just because the folks at Kestrel were permitted to intervene.

Doc. 77 at 71:5-23.  Thus, the legal effect of Kestrel's intervention is not quite as clear as Defendant claims.  Further, Defendant is reminded (yet again), that in every case in which a court invoked equitable estoppel based on the "interdependent and concerted misconduct" exception, the signatory that was resisting arbitration had actually *made allegations* in the complaint of such misconduct against another signatory *and* the non-signatory in question.  *See* Doc. 86 at 46. Here, Plaintiff's complaint makes no allegations whatsoever against Kestrel, and Defendant would have the Court find that such allegations exist where none were made.

## IV.    Court's Observations of Parties' Use of Appeal Process under 28 U.S.C. §636

Under 28 U.S.C. §636(b)(1)(C), "[w]ithin fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court."  The PFRD in this case was filed on July 15, 2020 (Doc. 86). Objections were filed by Plaintiff, Kestrel and Defendant on July 29, 2020, within the fourteen-day period. Docs. 87, 88, & 89.  However, the parties then went far beyond the filing of objections, taking the appeals process to a new—and outlandish—level as shown in the table below, highlighting the three sets of objections:

| **Objections** | | | |
|---|---|---|---|
| Kestrel's Objections Doc. 87 (7/29/20) | Pltff's Resp. Doc. 92 (8/12/20) | Kestrel's Reply Doc. 94 (8/26/20) | |
| Deft. Salt Creek's Objections Doc. 88 (7/29/20) | Pltff's Resp. Doc. 93 (8/12/20) | | |
| Pltff's Objections Doc. 89 (7/29/20) | Kestrel's Resp. Doc. 90 (8/12/20)<br><br>Deft's Resp. Doc. 91 (8/12/20) | Pltff's Reply to Kestrel's Objections Doc. 95 (8/26/20)<br><br>Pltff's Reply to Deft's Objections Doc. 96 (8/26/20) | Kestrel's surreply Doc. 97 (9/8/20) |

| **Miscellaneous** | |
|---|---|
| Pltffs' Notice of Supp. Auth. Doc. 98 (9/11/20) | Kestrel's Resp. to Notice of Supp. Auth. Doc. 99 (9/17/20) |

What the table visually indicates is that *two months* following the filing of the PFRD by the Magistrate Judge, the parties were still filing pleadings having yet more to say on the issues.

Having had to review all thirteen documents, the Court can say with certainty that it needed to review no more than the three sets of objections filed by each party in order to reach its conclusions—which affirmed every one of the Magistrate Judge's findings and recommendations. None of the subsequent pleadings—and this includes Plaintiffs' Notice of Supplemental Authority (Doc. 98) and Kestrel's surreply (Doc. 97) were necessary and none affected the Court's analysis in the end. The purpose of an appeal of a Magistrate Judge's PFRD is to provide parties with the opportunity to register its disagreements with the proposed findings and recommendations. Instead, the parties took advantage of the process to relitigate the issue and see who could get in the last word with the Court. In turn, the Court was forced to read at least four times as many briefs (13 briefs as opposed to 3 sets of objections) spending time which it simply does not have during a time when the COVID-19 pandemic poses new challenges for judicial efficiency and when concomitant vacancies for active Article III judges continue to burden the Court in a district that is already overloaded even in the best of times.

**THEREFORE,**

**IT IS ORDERED** that the Objections to the PFRD filed by (1) Kestrel (Doc. 87); (2) Defendant Salt Creek (Doc. 88); and Plaintiffs (Doc. 89); are hereby OVERRULED;

**IT IS FURTHER ORDERED** that the Court hereby ADOPTS the Magistrate Judge's Proposed Findings and Recommendations (Doc. 86).

_____
WILLIAM P. JOHNSON
CHIEF UNITED STATES DISTRICT JUDGE